UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

THE CITY OF NEW YORK,

                                        Plaintiff,              Civil Action No. 20-cv-5965

                    -against-
                                                                **COMPLAINT**
OLD DOMINION TOBACCO COMPANY,
INCORPORATED d/b/a ATLANTIC DOMINION
DISTRIBUTORS,

                                        Defendant.

-------------------------------------------------------------------- x

        Plaintiff the City of New York (the "City"), by its counsel, James E. Johnson,

Corporation Counsel of the City of New York, alleges as follows, with knowledge of its own

actions and on information and belief as to the actions of others:

## NATURE OF THE ACTION

        1.      This is an action for injunctive relief, damages and penalties arising out of the

trafficking of "untaxed" cigarettes into New York City.[1]

        2.      Defendant Old Dominion Tobacco Company Incorporated, d/b/a Atlantic

Dominion Distributors ("Atlantic Dominion"), is a wholesale distributor of convenience store

---

[1] "Untaxed" cigarettes are those on which New York State and City cigarette excise taxes should have been, but were not, pre-paid because the cigarettes were introduced into the State by means that evade New York's mandatory cigarette distribution system.  For the reasons explained more fully below, cigarettes intended for trafficking typically have taxes paid on them in the state in which they were purchased, but not in the state into which they are trafficked.  *See City of N.Y. v. Hatu*, 2019 U.S. Dist. LEXIS 91576, at *5 n.2 (S.D.N.Y. May 31, 2019) ("Because these cigarettes were taxed in North Carolina, but do not bear authentic New York tax stamps, the Court uses the more precise term "under-taxed cigarettes."). Untaxed cigarettes are synonymously referred to as "unstamped" cigarettes because the required New York tax stamps, evidencing the payment of New York taxes, are not affixed; instead they bear the tax stamps of the state of purchase. Cigarettes stamped with the tax stamp of a jurisdiction other than the jurisdiction in which the cigarettes are found are nonetheless "contraband" cigarettes. *See* 18 U.S.C. § 2346(1).

inventory, including cigarettes. Atlantic Dominion sells Virginia-stamped cigarettes at wholesale prices inclusive of the Virginia cigarette tax to retail cigarette sellers throughout Virginia.

3.  For years, Atlantic Dominion has supplied certain cigarette retail stores in Virginia with their inventory of Virginia-stamped cigarettes, with the knowledge that the stores were selling large quantities of those cigarettes to cigarette traffickers.

4.  Cigarette traffickers shuttle between Virginia and New York, buying cheaper Virginia-stamped cigarettes from retailers and selling the cigarettes in New York and elsewhere for more than the Virginia purchase price, but less than the higher, out-of-state market price. These transactions are made profitable by the disparity, for example, between the $3.40 per carton Virginia tax and the $58.50 per carton New York tax incorporated into the wholesale price in each state. Traffickers profit directly from this arbitrage opportunity; Atlantic Dominion and its convenience store customers profit from the sizeable increase in sales volume gained by, in effect, serving a portion of the New York City cigarette market. The scheme is not of recent vintage. *See United States v. Di Maria*, 727 F.2d 265 (2d Cir. 1984) ("'Bootleg cigarettes' are those purchased in a low-tax state, e.g., [Virginia], and then transported to a high-tax state, e.g., New York.").

5.  Atlantic Dominion knew that it was supplying cigarettes that would be transported for distribution in New York City and State. To begin with, Atlantic Dominion sold quantities of cigarettes to convenience stores in amounts vastly exceeding the number of cartons that reasonably could have been sold by these stores to consumers in the sparsely populated locations where the stores were situated.

6.     In addition, the run-down appearance of many of the retail stores supplied by Atlantic Dominion made clear that walk-in, consumer purchases could not have reasonably accounted for the volume of cigarettes these stores were purchasing from Atlantic Dominion.

7.     The cigarette volumes purchased were so excessive that, on that basis, Philip Morris, Inc. (also known as Philip Morris USA ("PM-USA")), a major supplier of cigarettes to Atlantic Dominion, warned Atlantic Dominion on many occasions of specific Atlantic Dominion customers that supplied cigarette traffickers.

8.     Moreover, certain Atlantic Dominion retail customers informed Atlantic Dominion personnel that the retailers were supplying cigarettes to out-of-state customers. Atlantic Dominion assured the customers that such sales were legal.

9.     Atlantic Dominion thus had knowledge that purchases by certain cigarette retail customers were far larger than what could be accounted for by consumer, as opposed to bulk, purchases.

10.     Atlantic Dominion continued to make cigarette sales to certain retail customers with the knowledge that the retailers knowingly sold to cigarette traffickers who transported the cigarettes out of state.

11.     Atlantic Dominion has thereby participated in the shipment, transport, receipt, possession, distribution or sale of massive quantities of untaxed cigarettes in and into New York and elsewhere, contributing to millions of dollars in evaded New York cigarette taxes and injuring the public health.

12.     By distributing, selling, possessing, shipping, and transporting cigarettes not affixed with the joint New York State and City tax stamp in and into New York City, Atlantic Dominion, its retail customers, and the cigarette traffickers patronizing those retailers engaged in

transactions with "contraband cigarettes" as defined by the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 et seq. ("CCTA").[2]

13.     Atlantic Dominion, its retail customers, and their trafficker customers operated as a racketeering enterprise as defined by the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), by associating for the purpose of distributing untaxed cigarettes into New York and elsewhere, a RICO predicate act. That RICO enterprise is referred to hereafter as the "Atlantic Dominion Enterprise" or "the Enterprise."

14.     The violations of the law described above injure the public health and the fiscal interests of New York City, entitling the City to an order: i) enjoining Atlantic Dominion from distributing, selling, receiving, possessing, shipping or transporting contraband cigarettes into New York City and State in violation of the CCTA and RICO; (ii) requiring Atlantic Dominion to pay the City money damages under the CCTA in an amount equal to the amount of the New York City cigarette tax that should have been paid on each carton of cigarettes trafficked into New York City; (iii) under RICO, requiring Atlantic Dominion to pay the City money damages equal to three times the amount of the damages awarded under the CCTA; (iv) awarding civil penalties under the CCTA; and (v) awarding attorney's fees provided for under the RICO statute.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964, 18 U.S.C. § 2346 (b)(1), 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367(a).

---

[2] Cigarettes possessed for sale or use in New York City must be affixed with New York State and New York City excise tax stamps, the purchase of which serves as the pre-payment of State and City cigarette excise taxes. Cigarettes found in New York that do not bear New York tax stamps are "contraband" cigarettes within the meaning of the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq*., regardless of whether the cigarettes bear a tax stamp of another jurisdiction.

16.     Venue is proper in this district under 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## PARTIES

17.     The City is a municipal corporation organized under the laws of the State of New York.

18.     Atlantic Dominion is the trade name of Old Dominion Tobacco Co., Inc., a corporation formed under the laws of the State of Virginia with a principal place of business at 5400 Virginia Beach Blvd., Virginia Beach, VA 23462.   Atlantic Dominion distributes convenience store inventory, including cigarettes, to retail outlets, advertising itself as the 16th largest convenience store distributor in the United States, with offices in Virginia and North Carolina.

## BACKGROUND

19.     Cigarette smoking is a leading cause of preventable premature death in the United States and in New York State. Smoking annually kills more than 480,000 people nationwide; tobacco use kills between 26,000 and 28,000 New Yorkers each year, a figure that exceeds the combined number of deaths from alcohol, motor vehicles accidents, and firearms.

20.     Smoking-related disease is a substantial drain on the public treasury, costing approximately $300 billion a year in health-care and lost productivity.  New Yorkers spend approximately $10.4 billion a year in health-care costs related to tobacco use, which includes $3.3 billion in Medicaid expenditures.

21.     The public health and economic costs of tobacco use have compelled all levels of government to regulate strictly the sale and use of tobacco.  Numerous studies have shown that

smoking is most effectively discouraged by increasing the cost of cigarettes through the imposition of high cigarette taxes.  Report of the Surgeon General, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease*, at 654 (2010) (noting that "increases in the price of cigarettes through excise taxes . . . are an effective policy intervention to prevent smoking initiation among adolescents and young adults, reduce cigarette consumption, and increase the number of smokers who quit"); Report of the Surgeon General, *E-Cigarette Use Among Youth and Young* Adults, at 155 (2016) ("[t]he sizeable body of research examining the effects of taxes and prices on the sale and use of conventional cigarettes . . . leads to the conclusion that price increases resulting from higher excise taxes are effective tools for reducing cigarette consumption, especially among youth"); Nathan J. Doogan, et al., *The impact of a federal cigarette minimum pack price policy on cigarette use in the USA*, Tobacco Control, 27:203-208 (2018).[3]  The relationship between cigarette prices and public health is sufficiently close that the rate of infant mortality in a particular jurisdiction are affected by cigarette prices in that jurisdiction, so much so that researchers have stated that "Federal and state policymakers may consider increases in cigarette taxes as a primary prevention strategy for infant mortality."[4]

---

[3] *See also* Martijin van Hasselt, et al., The relation between tobacco taxes and youth and young adult smoking: What happened following the 2009 U.S. federal tax increase on cigarettes?, Addictive Behaviors, 45:104-109 (2015); Chaloupka FJ, Yurekli A, Fong GT. Tobacco taxes as a tobacco control strategy. Tob Control 2012;21:172–80; Inst. of Med., Ending the Tobacco Problem: A Blueprint for the Nation 80, 182 (2007); *Prevent All Cigarette Trafficking Act of 2007, and the Smuggled Tobacco Prevention Act of 2008: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, Serial No. 110-47, at 52 (May 1, 2008) (Statement of Matthew L. Myers, President, Campaign for Tobacco-Free Kids); International Agency for Research on Cancer (IARC) Handbook of Cancer Prevention Volume 14: Effectiveness of Tax and Price Policies for Tobacco Control. *See* chapters 5 (adult) and 6 (youth) (the response of youths to increases in cigarette prices is even greater, with a ten-percent price increase reducing the number of youth smokers by an estimated six or seven percent).

[4] http://pediatrics.aappublications.org/content/137/1/e20152901#F2.

## CIGARETTE TAXATION AND REGULATION IN NEW YORK

22.     To discourage cigarette use, the City and State of New York have imposed separate excise taxes on cigarettes that combine to form among the highest cigarette taxes in the Nation.  With exceptions not relevant to this complaint, the tax applies to all cigarettes possessed for sale or use in the State or City.[5] All cigarettes present in the State are presumed subject to the cigarette tax until the possessor establishes the contrary. New York Tax Law § 471, § 471-a; Administrative Code of the City of New York ("Ad. Code") § 11-1302.

23.     One carton of cigarettes contains ten (10) packs of twenty (20) cigarettes.  At all times relevant to this complaint, the New York City excise tax has been $1.50 per pack or $15.00 per carton. At all times relevant to this complaint, the New York State excise tax has been $4.35 per pack or $43.50 per carton.

24.     All cigarettes possessed for sale in New York State and City, with exceptions not relevant to this complaint, must bear tax stamps, which serve as proof that the tax has been paid by cigarette wholesalers licensed by the state and City to collect the tax. N.Y. Tax L. § 471; 20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-1302(g). Every pack of cigarettes in New York State, with exceptions not relevant here, is required to have affixed to it a New York State excise tax stamp, evidencing tax paid to the State of $4.35. Every pack of cigarettes in New York City is required to have affixed to it a joint New York State/New York City tax stamp, the City's share of which is $1.50 in tax.

25.     State and City cigarette excise taxes, with exceptions not relevant here, are permissibly paid exclusively by "cigarette stamping agents," usually wholesale cigarette dealers, licensed by the State and City of New York to purchase and then affix tax stamps to the

---

[5] The "use" of cigarettes in the State or City is "any exercise of a right or power, actual or constructive, including but not limited to receipt, storage or any keeping or retention for any length of time."  New York Tax Law § 471-a, Ad. Code § 11-1301(4).

cigarettes they then sell to cigarette retailers..  The price of the tax stamp purchased and affixed by the stamping agent is approximately equal to the amount of the tax owed, plus "pre-paid" sales tax (at a rate set annually by the New York State Department of Taxation and Finance). By purchasing a cigarette tax stamp for every package of cigarettes possessed by the agent for sale in the State and/or City, the tax is paid. The affixed stamp serves as proof of payment.  N.Y. Tax L. § 471; 20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-1302(e).

26.     New York State mandates that stamping agents serve as the only entry point for cigarettes into New York's stream of commerce. With exceptions not relevant here, no other person other than a stamping agent is authorized to pay the cigarette tax. By law, the stamping agent must incorporate the amount of the tax into the price of the cigarettes, thereby passing the tax burden, not the tax itself, to each subsequent purchaser of the cigarettes in the distribution chain, and ultimately to the consumer, as required under N.Y. Tax L. § 471 and Ad. Code § 11-1302(e) and (h).

27.     Neither Atlantic Dominion nor any member of the Atlantic Dominion Enterprise is a New York-licensed stamping agent or licensed to deal in cigarettes in New York State or City.

## CIGARETTE TAX AVOIDANCE PRACTICES

28.     State and local governments independently set the amount of cigarette taxes imposed in their jurisdictions.  Because the amount of the tax is always included in the wholesale price, significant differences arise in cigarette prices among different taxing jurisdictions, and cigarettes can be purchased at far lower prices in jurisdictions imposing low cigarette taxes than in those imposing high cigarette taxes.  It is well known that New York State and City cigarette taxes combine to form among the highest cigarette tax in the nation.

29.     The price differences created by disparities in taxes imposed give rise to schemes to evade cigarette taxes. Substantial profits are gained by exploiting this "cross-border" market, in which cigarettes purchased at the low prices available in jurisdictions with low cigarette jurisdictions are sold at higher, but still below the market price, in high-tax jurisdictions

30.     The availability of cigarettes priced below the prevailing market price in high-tax jurisdictions defeats the deterrent effect of high cigarette prices, so that "limit[ing] smuggling and the availability of untaxed tobacco products is essential to maximizing the effectiveness of higher taxes in reducing tobacco use[.]". *See* Report of the Surgeon General, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease* (2010), at 654[6]; Nathan J. Doogan, et al., *The Impact of a Federal Cigarette Minimum Pack Price Policy On Cigarette Use In The USA*, Tobacco Control, 27:203-208 (2018).

31.     A contention that cigarette tax evasion is caused by the choice of a taxing jurisdiction to impose high cigarette taxes self-evidently provides a false picture of causation, because the price disparity across state borders, not high or low taxes *per se*, that creates the arbitrage opportunity. Price disparities conducive to cross-border smuggling are as attributable to the choice of tobacco-producing jurisdictions to favor tobacco sales through low tobacco taxes as they are to the choice of jurisdictions that seek the health-protective effect of high taxes.

## ATLANTIC DOMINION'S ROLE IN CROSS-BORDER SMUGGLING

32.     As a wholesaler, Atlantic Dominion sells cigarettes to retail cigarette outlets in Virginia and North Carolina; the wholesale price of the cigarettes reflects the inclusion of the

---

[6] *Available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2010/index.htm. ("'Untaxed' cigarettes are those in which the tax owed on the cigarettes has not been paid.  Untaxed cigarettes may be profitably sold at lower prices because the seller did not incur the cost of taxes.")

low Virginia or North Carolina tax paid by Atlantic Dominion when purchasing the cigarettes from manufacturers.

33.     Cigarette traffickers purchase the Virginia-taxed cigarettes from the retail stores and transport the cigarettes to New York City, where the cigarettes are sold to others at prices greater than the Virginia purchase price but below the City market price.

34.     For example, between April 2019 and May 2019, cigarette traffickers purchased at least 9,000 cartons of Virginia-stamped cigarettes from a cigarette retail store located in Spotsylvania County, Virginia, with an inventory of cigarettes supplied solely by Atlantic Dominion. The traffickers then transported the cigarettes to their New York City residences, where the cigarettes were held for re-sale. The cigarette traffickers met with the owners and the employees of the retail store, all of whom knew, based on many conversations over time, that the traffickers transported the cigarettes purchased at the store to New York City. The retail store employees would assist in loading the traffickers' vehicles, which generally bore New York license plates, with cigarettes purchased from the store.

35.     Retail store owners and employees have admitted to law enforcement investigators that they knew that particular customers purchased large quantities of Virginia-stamped cigarettes to traffic into New York City. Through weekly or semi-weekly purchases over the course of many months, if not years, individual cigarette traffickers became well-known to the convenience store's employees, with the traffickers and the employees on a first-name basis with one another.

36.     After the arrest of one of the cigarette traffickers, an employee of the cigarette retail store wrote an internal memorandum detailing the arrest and stating that the owner of the

Spotsylvania County cigarette store told her to "cool it down" and "not have any buyers this week or next week and to cancel their orders."

37.     The Spotsylvania County retail store maintained spreadsheets for its trafficker customers that recorded the store's cigarette sales to the traffickers. Analyses taken from incomplete sets of such spreadsheets indicate that the cigarette retail store sold the traffickers approximately $1.3 million worth of cigarettes, *i.e*., approximately 15,000 cartons, every thirty (30) days.

38.     Atlantic Dominion had actual and constructive knowledge that it was supplying certain of its retail customers with Virginia-stamped cigarettes, which the retailers then sold to cigarette traffickers. Despite that knowledge, Atlantic Dominion continued to sell to those retail customers in order to benefit from the significant increases in cigarette sales volumes; the retail customers enabled Atlantic Dominion to serve a major market – New York City – at competitively-advantaged, below-market prices.

### Philip Morris USA's Warnings To Atlantic Dominion

39.     Philip Morris USA ("PM-USA") is a major manufacturer of cigarettes and other tobacco products, headquartered in Richmond Virginia.

40.     To obtain marketing information, PM-USA closely monitored the sales volume of wholesale customers such as Atlantic Dominion to determine whether the wholesalers were supplying PM-USA cigarettes to retailers that in turn sold cigarettes in quantities inconsistent with the expectation for a retail outlet of a given size and location. PM-USA's monitoring was aimed at determining that its products were sold to walk-in, retail consumers, not to cigarette traffickers transporting bulk purchases of cigarettes out of state.

41.     Cigarette manufacturers promote sales by providing wholesalers with volume-based financial incentives. Manufacturers intend those incentives to promote genuine retail

consumer sales, not bulk sales to cigarette traffickers. Accordingly, PM-USA reduced the amount of incentive payments when a wholesaler's retail customers sold more than a pre-determined limit of PM-USA cigarettes, reasoning that a sales volume inconsistent with the store's size and location evidenced a retailer supplying bulk sales to cigarette traffickers.

42.     Throughout each quarter, PM-USA sent weekly warnings to wholesalers having retail customers that PM-USA identified as having purchased PM-USA product in volumes inconsistent with retail consumer sales.  The letters warned the wholesalers of particular convenience stores whose purchases from the wholesaler were likely to or already had exceeded the volume indicative of trafficked sales, jeopardizing the wholesaler's incentive payments.  The letters served to warn a wholesaler that PM-USA believed that certain of the wholesaler's retail customers were selling PM-USA cigarettes in amounts consistent with sales to cigarette traffickers, and that, as a result, PM-USA incentive payments to the wholesaler could be withheld.

43.     PM-USA audited certain wholesale customers, including Atlantic Dominion, for compliance with PM-USA's anti-trafficking guidelines. The audits required wholesalers to allow inspections of their transactions with selected retail customers to determine if indicia of trafficking were present.

44.     Between at least March 28, 2016 and April 24, 2017, PM-USA identified to Atlantic Dominion on a weekly basis certain Atlantic Dominion retail customers that had or would exceed by the end of the quarter the cigarette sales volume eligible for financial incentive payments. Each week, PM-USA informed at least four Atlantic Dominion employees by email of the identity of retail cigarette customers on track to succeed or already had exceeded the carton volume limit set by PM-USA:

> While you are responsible for knowing your customers and may sell to any customer you choose, as a courtesy, PM USA is notifying you which customers have exceeded 8000 PM USA cartons for Quarter 4 Year 2016 with 13 weeks reported, and may exceed the 10400* cap by the conclusion of the Quarter (please see attached).

45.     By those emails, PM-USA warned Atlantic Dominion on approximately 53 separate occasions that the cigarette retail store or stores identified in the email met the criteria PM-USA had established to conclude that the retailer was supplying cigarette traffickers. Atlantic Dominion nonetheless continued to supply the cigarette retailers identified by PM-USA with volumes of cigarettes consistent with supplying traffickers.

46.     Atlantic Dominion received conclusive, direct information that one or more of the retail cigarette stores identified by PM-USA to Atlantic Dominion as purchasing excessive quantities of cigarettes regularly sold cigarettes in bulk quantities to traffickers.

## ALLEGATIONS RELATED TO THE CCTA

47.     The CCTA, 18 U.S.C. §§ 2341-2346, makes it a felony punishable by up to five years' imprisonment for any person, with exceptions not relevant here, to ship, transport, receive, possess, sell, distribute or purchase "contraband cigarettes."

48.     "Contraband cigarettes" are defined as more than 10,000 cigarettes (*i.e.*, more than 50 cartons or 500 packs of cigarettes) that bear no evidence of the payment of applicable cigarette taxes to the State or locality in which the cigarettes are found, if that jurisdiction requires stamps to be placed on packages or other containers of cigarettes to evidence tax payments. 18 U.S.C. §§ 2341(2) and 2342.

49.     The CCTA was enacted to assist state and local governments in enforcing their tobacco laws and accordingly provides those governments with the authority to bring civil enforcement actions. *See* 18 U.S.C. § 2346.

50.     New York City and State each impose an excise tax on cigarettes possessed for sale or use in the City and State, requiring a joint City-State tax stamp to be affixed to every pack of cigarettes as evidence that cigarette taxes have been paid. N.Y. Tax L. §§ 471, 471-a; Ad. Code § 11-1302.

51.     None of the cigarettes shipped, transported, received, possessed, sold, distributed or purchased by Atlantic Dominion, or the Virginia retail stores supplied by Atlantic Dominion, or the cigarette traffickers that purchased from those stores, were affixed with joint New York State/New York City tax stamp.  Nor could they have been; only licensed New York "stamping agents" are permitted to affix tax stamps, and Atlantic Dominion, their retail store customers, and the traffickers did not hold such licenses.

52.     None of the cigarettes shipped, transported, and distributed in or into New York by Atlantic Dominion, or the Virginia retail stores supplied by Atlantic Dominion, or the traffickers were delivered to a New York-licensed stamping agent.

53.     The cigarettes shipped, transported, received, possessed, sold, distributed or purchased by Atlantic Dominion, the Virginia retail stores supplied by Atlantic Dominion, or the traffickers are contraband cigarettes within the meaning of the CCTA because (i) there is a New York State and City cigarette tax applicable to the cigarettes; (ii) New York State and City each require a stamp to be placed on packages of cigarettes to evidence payment of cigarette taxes; (iii) the Atlantic Dominion Enterprise sold, possessed, distributed, and transported more than 10,000 cigarettes found within New York State and the City without New York tax stamps; and (iv) Atlantic Dominion, the Virginia retail stores supplied by Atlantic Dominion, or the traffickers do not meet the exceptions under 18 U.S.C. § 2341(2) permitting transactions with unstamped cigarettes.

54.     Atlantic Dominion had actual and constructive knowledge that the cigarettes that the Atlantic Dominion Enterprise shipped, transported, sold, or distributed in and into New York City, which far exceeded 10,000 cigarettes, were transported from out-of-state for sale and distribution without tax stamps affixed and without payment of applicable cigarette taxes.

55.     Atlantic Dominion's sale and shipment of contraband cigarettes to its retail customers, knowing that those cigarettes would be sold, transported, and distributed into New York City and elsewhere without payment of the requisite taxes, violates the CCTA.

## ALLEGATIONS RELATED TO RICO

56.     The RICO statute, 18 U.S.C. § 1961 *et seq.*, makes it unlawful for any person employed by or associated with any enterprise engaged in or affecting interstate commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

57.     "Racketeering activity" includes any act indictable under 18 U.S.C. § 2341 *et seq.*, including trafficking in contraband cigarettes in violation of the CCTA.  *See* 18 U.S.C. § 1961(1).  Thus, violation of the CCTA constitutes "racketeering activity" within the meaning of the RICO statute, and a CCTA violation is a RICO "predicate offense."

### The Enterprise

58.     Atlantic Dominion, each cigarette retail store to which Atlantic Dominion knowingly sells cigarettes for trafficking into New York and each trafficker of cigarettes from those stores is a member of or is associated with an association-in-fact enterprise referred to herein as the "Atlantic Dominion Enterprise" or "the Enterprise."

59.     The Atlantic Dominion Enterprise engages in the shipment, transport, receipt, possession, sale, distribution and purchase of contraband cigarettes by obtaining Virginia-taxed

cigarettes in Virginia for distribution and sale in New York City, and elsewhere, generating millions of dollars in illicit profits by evading New York's mandatory cigarette distribution system operated by state-licensed stamping agents.

60.     At all times relevant to this complaint, the Atlantic Dominion Enterprise has been an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The Atlantic Dominion Enterprise engages in, and its activities affect, interstate commerce. The Atlantic Dominion Enterprise constitutes an ongoing organization whose employees and members function as a continuing unit for the common purpose of achieving the objectives of the Enterprise, which include earning money by distributing Virginia-stamped cigarettes in New York City.

61.     Atlantic Dominion participates in the affairs of the Atlantic Dominion Enterprise by selling Virginia-stamped cigarettes to cigarette retail stores knowing that those stores intend to sell the cigarettes to traffickers who in turn intend to and do transport the cigarettes out of Virginia for distribution and sale in New York City.

62.     Atlantic Dominion participates in the affairs of the Atlantic Dominion Enterprise by supplying cigarettes to what Atlantic Dominion knows to be "fronts," in which apparent Virginia retail cigarette outlets in fact are operated not as legitimate retail outlets but instead as principally sources of cigarette sales to cigarette traffickers.

### The Purposes, Methods and Means of the Enterprise

63.     The principal purpose of the Atlantic Dominion Enterprise is to generate money for its members by engaging in the shipment, transport, receipt, possession, sale, distribution or purchase of contraband cigarettes. Atlantic Dominion has sought to and did participate in achieving the purpose of the Enterprise through various legal and illegal activities, principally involving transactions with contraband cigarettes.

64.     Atlantic Dominion received orders for cigarettes from cigarette retail stores and filled those orders knowing that the cigarettes sold by the stores would in turn be sold to traffickers for immediate transport to New York City and elsewhere without having been affixed with the tax stamps of any state other than Virginia. In filling those orders, Atlantic Dominion took steps to permit the Enterprise to succeed in earning money through the distribution of contraband cigarettes.

65.     The cigarette retail stores in the Atlantic Dominion Enterprise received orders for cigarettes from the traffickers and filled those orders knowing that the cigarettes sold to the traffickers were not affixed with joint New York State/New York City tax stamps or the stamps of other states and would be immediately transported to New York or elsewhere outside of Virginia. The retail store members of the Enterprise took steps to permit the Enterprise to succeed in earning money through the distribution of contraband cigarettes.

66.     At all times relevant to this complaint, Atlantic Dominion participated in the conduct of the affairs of the Atlantic Dominion Enterprise by shipping, selling, and distributing contraband cigarettes in or into New York City and State, and elsewhere, or by arranging therefor.

67.     At all times relevant to this complaint, Atlantic Dominion conducted the affairs of the Atlantic Dominion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B), consisting principally of multiple and continuing instances of contraband cigarette trafficking in violation of 18 U.S.C. § 2341 *et seq.*

**Racketeering Acts**

68.     At all times relevant to this complaint, Atlantic Dominion, the retail store members of the Enterprise and the trafficker members of the Enterprise knowingly and

- 17 -

intentionally shipped, transported, received, possessed, sold, distributed or purchased contraband cigarettes, namely, more than 10,000 cigarettes lacking joint New York State/New York City tax stamps, in violation of the CCTA, 18 U.S.C. § 2341 *et seq.* Each transaction or aggregate of transactions involving more than 10,000 cigarettes constitutes a separate violation of the CCTA and hence an act of racketeering as defined by the RICO statute. Atlantic Dominion, the retail store members of the Enterprise and the trafficker members of the Enterprise committed more than two racketeering acts during the ten years preceding the filing of this complaint.

69. The foregoing racketeering acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, in that they consist of two or more acts of racketeering activity having a common purpose within a ten-year period.

## Role of Atlantic Dominion

70. At all times relevant to this complaint, Atlantic Dominion participated in the management and operation of the Atlantic Dominion Enterprise by, among other things:

   a. Engaging in the long-term planning and day-to-day activities required to sell, ship and distribute cigarettes to retail customers that Atlantic Dominion knew were selling to cigarette traffickers.

   b. Arranging for the sale, shipment, transport and distribution of cigarettes that Atlantic Dominion knew would be transported out of Virginia by traffickers but not affixed with the tax stamps of any state except Virginia.

   c. Receiving and filling orders for Virginia-stamped cigarettes from cigarette retail stores knowing that the cigarettes would be transported out of Virginia by traffickers but not affixed with the tax stamps of any state except Virginia.

   d. Selling cigarettes to cigarette retail store knowing and intending that the cigarettes would be transported out of Virginia by traffickers but not affixed with the tax stamps of any state except Virginia.

   e. Employing and instructing other individuals to engage in all of the above activities.

## ALLEGATIONS RELATED TO CONSPIRACY TO VIOLATE RICO

71.     At all times relevant to this complaint, Atlantic Dominion, the retail store members of the Enterprise and the trafficker members of the Enterprise conspired among themselves to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by agreeing to further endeavors of the Atlantic Dominion Enterprise that, when completed, constituted contraband cigarette trafficking, in violation of the CCTA, 18 U.S.C. § 2341 *et seq*.

72.     At all times relevant to this complaint, Atlantic Dominion, the retail store members of the Enterprise and the trafficker members of the Enterprise agreed to a plan whereby Atlantic Dominion would sell large numbers of Virginia-stamped cigarettes to the retail store members of the Enterprise, providing the stores with an inventory of Virginia-stamped cigarettes sufficient to supply the trafficker members of the Enterprise, whom both Atlantic Dominion and the cigarette retail stores knew and intended would transport the cigarettes out of the state of Virginia.

73.     At all times relevant to this complaint, Atlantic Dominion, the retail store members of the Enterprise and the trafficker members of the Enterprise agreed to a plan whereby the traffickers would obtain large quantities of Virginia-taxed cigarettes from the cigarette retail stores and sell the cigarettes in New York City without New York State or City tax stamps.

74.     Atlantic Dominion, the cigarette retail stores and the traffickers each recognized that an essential element of the plan consisted of multiple violations of the CCTA, 18 U.S.C. § 2341 *et seq*. The cigarette retail stores and the traffickers agreed that certain members of the Atlantic Dominion Enterprise would commit CCTA violations while other Enterprise members would engage in conduct intended to support and facilitate those violations of the CCTA.

75.     At all times relevant to this complaint, Atlantic Dominion, the cigarette retail stores and the traffickers formed the Atlantic Dominion Enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, and then knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1), (5).

76.     The pattern of racketeering activity through which Atlantic Dominion, the cigarette retail stores and the traffickers agreed to conduct the affairs of the Atlantic Dominion Enterprise consisted of acts of contraband cigarette trafficking into New York City. Atlantic Dominion, the cigarette retail stores and the traffickers each agreed that some conspirators would commit at least two acts of racketeering in conducting the affairs of the Atlantic Dominion Enterprise and other conspirators would assist in those acts.

## FIRST CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 2341 *et seq.*)

77.     The City realleges paragraphs 1-76 above as if fully set forth herein.

78.     Pursuant to the CCTA, 18 U.S.C. § 2346, the City, as a local government, is empowered to bring an action in federal district court to prevent and restrain violations of the CCTA, and to obtain any other appropriate forms of relief from CCTA violations, including civil penalties, equitable remedies, and damages.

79.     At all times relevant to this complaint, Atlantic Dominion knowingly shipped, transported, sold and/or distributed contraband cigarettes within the meaning of 18 U.S.C. § 2341(2), in that Atlantic Dominion engaged in such activities with more than 10,000 cigarettes that bore neither the New York State tax stamp nor the joint New York State/New York City tax

stamp and were possessed by, shipped, transported, sold and distributed to persons located in New York City.

80.     As a direct result of the foregoing violations of the CCTA by Atlantic Dominion, the City has suffered and continues to suffer damages.

81.     Atlantic Dominion will continue to violate the CCTA unless enjoined.

## SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c))

82.     The City realleges paragraphs 1-81 as if fully set forth herein.

83.     New York City is a "person" as defined in 18 U.S.C. § 1961(3).

84.     Atlantic Dominion is a "person" as defined in 18 U.S.C. § 1961(3) and used in 18 U.S.C. § 1962(c).

85.     The Atlantic Dominion Enterprise is an "enterprise" as defined in 18 U.S.C. § 1961(4) and used in 18 U.S.C. §§ 1962(c).   The Atlantic Dominion Enterprise engages in activities affecting interstate commerce and has done so at all times relevant to this complaint.

86.     Atlantic Dominion, each cigarette retail store to which Atlantic Dominion knowingly sells cigarettes for trafficking into New York and each trafficker of cigarettes from those stores is a member of or is associated with the Atlantic Dominion Enterprise.

87.     Atlantic Dominion, each such cigarette retail store and each such trafficker conducts or participates in the management and operation of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), namely, multiple and repeated acts of contraband cigarette trafficking, in violation of 18 U.S.C. §§ 2341 *et seq.*

88.     The acts of contraband cigarette trafficking engaged in by the Atlantic Dominion Enterprise constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §

1961(5), because the acts are related to one another and are continuous.  The acts are connected

to one another as part of a plan to accomplish a uniform purpose, which is the making of money

from the receipt, sale, possession, and distribution of contraband cigarettes.  The repeated nature

of the conduct and the threat of similar conduct occurring in the future make the acts continuous.

89.     New York City has suffered injury to its business or property within the meaning

of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(c) by the Atlantic

Dominion Enterprise cigarette retail stores and the traffickers.

**THIRD CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(d))**

90.     The City realleges paragraphs 1-89 as if fully set forth herein.

91.     New York City is a "person" as defined in 18 U.S.C. § 1961(3).

92.     Atlantic Dominion is a "person" as defined in 18 U.S.C. § 1961(3) and used in 18

U.S.C. § 1962(d).

93.     The Atlantic Dominion Enterprise is an "enterprise" as defined in 18 U.S.C. §

1961(4) and used in 18 U.S.C. §§ 1962(c).  The Atlantic Dominion Enterprise engages in

activities affecting interstate commerce and has done so at all times relevant to this complaint.

Atlantic Dominion, each cigarette retail store to which Atlantic Dominion knowingly sells

cigarettes for trafficking into New York, and each trafficker of cigarettes from those stores

conspired with one another to violate 18 U.S.C. § 1962(c) in that each of them agreed among

themselves to conduct the affairs of the Atlantic Dominion Enterprise through acts that, when

completed, would satisfy all of the elements of a predicate offense, to wit, contraband cigarette

trafficking, in violation of the CCTA, 18 U.S.C. §§ 2341 *et seq.*

94.     With knowledge that the Atlantic Dominion Enterprise engaged in multiple and

repeated acts of contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. §§ 2341, *et*

*seq.*, Atlantic Dominion, each cigarette retail store to which Atlantic Dominion knowingly sells cigarettes for trafficking into New York and each trafficker of cigarettes from those stores agreed among themselves that the affairs of the Atlantic Dominion Enterprise would be conducted in a manner that would facilitate cigarette trafficking and lead to the success of the scheme to traffic contraband cigarettes into New York City.

95.      The scheme to traffic contraband cigarettes into New York City constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  The predicate acts are both related and continuous.  The acts are connected to one another as part of a scheme to accomplish a uniform purpose, which is the profiting from the sale of contraband cigarettes in New York City.  The repeated nature of the conduct during the period of the scheme and the threat of similar conduct occurring in the future make the acts continuous.

96.      New York City has suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of the violation of 18 U.S.C. § 1962(d) by Atlantic Dominion, the cigarette retail stores and the traffickers.

**WHEREFORE**, New York City respectfully prays that the Court grant judgment against defendants as follows:

    a.   On the First Claim For Relief, requiring Atlantic Dominion (i) to pay the City money damages in an amount equal to the amount of the City tax imposed on the cigarettes distributed into the City by Atlantic Dominion in violation of the CCTA, 18 U.S.C. § 2341 *et seq*. and (ii) to pay the City civil penalties available under the CCTA and (iii) permanently enjoining Atlantic Dominion from shipping, transporting, selling, or distributing contraband cigarettes in or into New York in violation of the CCTA, 18 U.S.C. § 2341 *et seq.*;

    b.   On the Second Claim For Relief, pursuant to the RICO statute, 18 U.S.C. § 1962(c) *et seq*., requiring Atlantic Dominion to pay the City money damages in an amount equal to three times the amount of the City tax

imposed on the cigarettes distributed into the City by Atlantic Dominion in violation of RICO, and attorney's fees;

c.  On the Third Claim For Relief, pursuant to the RICO statute, 18 U.S.C. § 1962(d), requiring Atlantic Dominion to pay the City money damages in an amount equal to three times the amount of the City tax imposed on the cigarettes distributed into the City by Atlantic Dominion for conspiring to violate RICO, and attorney's fees; and

d.  Awarding such other and further relief as the Court may deem appropriate.

Dated: New York, New York
       December 8, 2020

**JAMES E. JOHNSON**
Corporation Counsel of the City of New York

By:      _____s/_____
         Eric Proshansky (EP 1777)
         Hope Lu (HL 6934)
         Assistant Corporation Counsel
         100 Church Street, Room 20-99
         New York, New York 10007
         (212) 356-2032
         eproshan@law.nyc.gov
         hlu@law.nyc.gov
         *Attorneys for Plaintiff the City of New York*