# EXHIBIT E

i9o2citC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
CITY OF NEW YORK,

                    Plaintiff,              New York, N.Y.

              v.                            18 Civ. 848(PAE)

H&H DISTRIBUTORS, et al.,

                    Defendants.
------------------------------x              Conference

                                            September 24, 2018
                                            2:30 p.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                            District Judge


                         APPEARANCES


ZACHARY W. CARTER
        Corporation Counsel of the City of New York
BY:  ERIC PROSHANSKY
        Assistant Corporation Counsel

CLAYMAN & ROSENBERG, LLP
        Attorneys for Defendants H&H Distributors and
        Shareef Hassan
BY:  PAUL S. HUGEL
        CHRISTINA M. CORCORAN


GERALD J. McMAHON
        Attorney for Defendants Mussa Hamza, Akram Shamakh,
        and Anwar Alsaidi


BLEAKLEY PLATT & SCHMIDT, LLP
        Attorneys for Defendant Amjed Hatu
BY:  WILLIAM M. MURPHY

i9o2citC

1          THE DEPUTY CLERK:  Counsellors, state your appearance

2     for the record, please.

3          MR. PROSHANSKY:   Good afternoon, your Honor.  Eric

4     Proshansky for plaintiff City of New York.

5          THE COURT:  Good afternoon, Mr. Proshansky.

6          MR. HUGEL:  Good afternoon, your Honor.  Paul Hugel

7     Clayman & Rosenberg, on behalf of Mr. Hassan and H & H, with my

8     associate Christina Corcoran.

9          THE COURT:  Very good.  Good afternoon to both of you.

10          MR. MURPHY:  Good afternoon, your Honor.  William

11     Murphy with Bleakley Platt & Schmidt.  I'm here for defendant

12     Amjed Hatu.

13          THE COURT:  Very good.  Good afternoon.

14          MR. McMAHON:  Good afternoon, your Honor.  Gerald

15     McMahon.  I am here for the defendants Hamza, Shamakh, and

16     Alsaidi, commonly known as the North Carolina retailers.

17          THE COURT:  Very good.  Good afternoon to you,

18     Mr. McMahon.  If memory serves, Mr. McMahon, back in '91, which

19     would have been 27 years ago, you and I had a trial together

20     when I was a young AUSA.

21          MR. McMAHON:  I was much younger then, Judge.  We can

22     say that with a certainty.

23          THE COURT:  And for the benefit of everyone in the

24     room, he won and I lost.

25          Very good.  Be seated.  Off the record.

1          (Discussion off the record)

2          THE COURT:  Good afternoon.  Let me begin by thanking

3     counsel for their thorough briefing in advance of today's

4     initial pretrial conference.  As you know, I had previously

5     indicated that this conference would serve as an oral argument

6     on the pending motions to dismiss.  Upon further reflection,

7     however, I determined that oral argument would not be

8     necessary.  I hope that my decision did not occasion any wasted

9     effort.

10         With that, I am going to resolve from the bench, right

11    now, the pending motions to dismiss.  I will put on the record

12    an explanation of the reasons for my ruling.  There will not be

13    a written decision.  Instead, the court will issue only a brief

14    bottom-line order setting out the disposition of the motions.

15    So if the reasons for the court's ruling are important to you,

16    you will need to order the transcript.

17         I am going to grant the motions.  Specifically, I have

18    concluded that the claims against defendants H & H

19    Distributors, Amjed Hatu, and Shareef Hassan must be dismissed

20    for want of personal jurisdiction.  Accordingly, I will dismiss

21    all claims against them without prejudice.  Once I have

22    finished reading this bench decision, I will therefore take up

23    with Mr. Proshansky and Mr. McMahon, who represent the

24    remaining parties, how discovery in this case ought to proceed

25    for their clients, the only remaining parties to this

1    litigation.

2         I am now going to explain why defendants' motions must be

3    granted.  In deciding these motions, I have assumed all

4    well-pled factual allegations in the amended complaint to be

5    true and drawn all reasonable inferences in plaintiff's favor.

6    *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d

7    Cir. 2012).  I note, however, that I have not considered the

8    affidavit of Detective Jonathan Dubroff.  That document was

9    first offered by defendants H & H Distributors and Mr. Hassan

10   as an exhibit supporting their motion to dismiss*, see* Dkt.

11   37-3, and then cited repeatedly by the City in its opposition

12   brief*, see* Dkt. 36.  This document clearly is not cognizable on

13   the instant motions.  It is neither incorporated by reference

14   in the amended complaint nor integral to it.  In fact, it is

15   not referenced in the amended complaint at all.  And although I

16   may take judicial notice of the fact that it was filed in a New

17   York State judicial proceeding, I may not assume the truth of

18   the matters asserted therein.  *See Global Network*

19   *Communications, Inc. v. City of New York,* 458 F.3d 150, 157 (2d

20   Cir. 2006.  That defendants improperly sought to introduce this

21   document is of no moment; neither party, including the

22   plaintiff, may rely on this document in litigating these

23   motions to dismiss.  Accordingly, the Dubroff affidavit plays

24   no role in my decision today.

25         Moving on to the facts put at issue in the amended

1   complaint, this case is brought by the City of New York, or as

2   I will refer to it, the "City," against six defendants.

3   Defendant H & H Distributors, or "H & H," is a wholesale

4   cigarette distributor in North Carolina.  As of the filing of

5   the amended complaint, the principals of H & H were defendants

6   Ajmed Hatu and Shareef Hassan.  I am going to refer to those

7   defendants -- H & H, Hatu, and Hassan -- collectively as the

8   H & H defendants.  Defendants Mussa Hamza, Akram Shamakh, and

9   Anwar Alsaidi are retailers who deal in cigarettes from

10  convenience stores in North Carolina.  I will refer to these

11  defendants collectively as "the North Carolina retailers."

12      The City alleges that defendants all participated in an

13  unlawful cigarette distribution scheme.  Per the amended

14  complaint, New York State and New York City impose a combined

15  $58.50 in excise taxes per carton of cigarettes.  North

16  Carolina imposes only $4.50 in analogous taxes.  Because these

17  excise taxes are prepaid and therefore incorporated into the

18  retail price of cigarettes, cigarettes are considerably more

19  expensive in New York City than in North Carolina.

20      The City alleges that defendants, along with other

21  members of what the City calls the "Moflehi Enterprise,"

22  capitalized on this opportunity for arbitrage.  As alleged,

23  their scheme worked as follows.  A member of the Moflehi

24  Enterprise in New York would transmit an order via text message

25  to a so-called "transporter" requesting a variety of cigarette

 1    brands and styles.  The transporter would then transmit that

 2    order via text message -- using roughly the same language -- to

 3    one of the North Carolina retailers.  The retailer in turn

 4    would transmit the order, again via nearly identical text

 5    message, to one of the H & H defendants.  The H & H defendants

 6    would then legally purchase cigarettes from manufacturers and

 7    other distributors in North Carolina and then sell those

 8    cigarettes at wholesale to one of the retailers.  The retailer

 9    in turn would pass the cigarettes along to one of the

10    transporters, likely the transporter who originally placed the

11    order, who would then deliver the cigarettes to New York.  Upon

12    receiving the imported cigarettes in New York, other members of

13    the enterprise would then affix counterfeit New York tax stamps

14    to the packaging and sell the cigarettes in New York at

15    below-market prices.

16         All agree that the H & H defendants operated only in

17    North Carolina and directly sold cigarettes only to the North

18    Carolina retailers.  There is no allegation that the H & H

19    defendants ever communicated directly with anyone operating in

20    any other state.  Nevertheless, the City alleges that the H & H

21    defendants knew that the cigarettes they supplied were destined

22    for illegal distribution in New York City.  In support, the

23    City cites the following.

24         First, at paragraphs 55 to 61 of the amended complaint,

25    the City describes a telephone conversation between Mr. Hatu

and Mr. Hassan that took place approximately one week after two
transporters were stopped by the New York City Police
Department, or "NYPD," while delivering cigarettes in New York
City.  In this conversation, Mr. Hatu told Mr. Hassan that,
earlier in the week, "Mussa and Akram's guy" had been "robbed
on the highway" of 6,000 cartons of cigarettes.  The City
alleges that "Mussa" and "Akram" likely refer to defendants
(and North Carolina retailers) Mussa Hamza and Akram Shamakh
and that the "robbery" was in fact the NYPD stop I just
mentioned.  On the same call, Mr. Hatu also noted that "they"
had been "hit" for $90,000 six months ago by the same two
"robbers."  This portion of the conversation, the City alleges,
likely referred to another NYPD seizure that had taken place
approximately four months prior in which the NYPD seized
approximately $100,000 from a vehicle operated by a Moflehi
Enterprise transporter.  *Id.*  According to the amended
complaint, Mr. Hatu and Mr. Hassan then observed that "they" --
another likely reference to Moflehi Enterprise transporters per
the amended complaint -- "probably need to get a new car and
find a different way to go."

Next, the City alleges that the H & H defendants'
knowledge can be inferred from two facts related to their
delivery of cigarettes:

First, in paragraph 62 of the amended complaint, the
City alleges that on "several occasions" cigarette orders were

1    picked up directly from H & H by transporters in cars bearing

2    out-of-state license plates.  At least one of these cars, the

3    City alleges, had New Jersey plates.

4         Second, in paragraph 63 of the amended complaint, the

5    City alleges that H & H occasionally delivered cigarette orders

6    not into the North Carolina retailers' stores, but instead

7    directly into vehicles outside those stores operated by the

8    North Carolina retailers or "others."  The City alleges that

9    these cigarettes would then be driven to the North Carolina

10    retailers' residences and from there transferred into

11    transporters' vehicles

12         And finally, at paragraphs 65 to 87, the amended

13    complaint provides statistics related to the relative

14    popularity of particular cigarette brands in different markets.

15    The City argues that these statistics tend to suggest that

16    H & H's sales were consistent with serving customers in New

17    York City, as opposed to North Carolina.

18         On the strength of these allegations, the amended

19    complaint seeks relief against the H & H defendants under five

20    statutes.

21         First, the City raises claims under the Contraband

22    Cigarette Trafficking Act (or "CCTA") 18 U.S.C. § 2341 and

23    following.  This statute makes it a felony for "any person

24    knowingly to ship, transport, receive, possess, sell,

25    distribute, or purchase contraband cigarettes."  *Id.* § 2342.

i9o2citC

The phrase "contraband cigarettes" refers to "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable state or local cigarette taxes in the state or locality where such cigarettes are found," and which are in the possession of a person not authorized by statute to possess such cigarettes. *Id.* § 2341.

Second, the City raises claims under the racketeering statute, 18 U.S.C. 1961 *et seq.* This statute makes it unlawful for any person employed by or associated with any enterprise engaged in or affecting interstate commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. As relevant here, "racketeering activity" includes trafficking in contraband cigarettes in violation of the CCTA.

Third, the City claims that the defendants conspired to violate RICO by agreeing to assist in the cigarette trafficking efforts of the Moflehi Enterprise.

Fourth, the City raises claims under the Prevent All Cigarette Trafficking Act, or the "PACT Act," which amended the Jenkins Act, 15 U.S.C. §§ 375 *et seq.* This statute prohibits a wide array of conduct, including delivering cigarettes into a state or locality without (1) first filing a statement with the Attorney General of the United States and the tax administrators of the state; (2) filing monthly reports of all cigarette shipments with the tax administrators of the state;

i9o2citC

(3) complying with state and local laws governing the sale of
cigarettes; (4) complying with certain shipping and packaging
requirements; and (5) using a method of shipping that requires
the person who receives the delivery to provide age
verification.

Finally, the City raises claims under New York Public
Health Law, or "PHL," Section 1399-ll.  That statute provides
that, in New York State, cigarettes may be shipped only to
licensed cigarette tax agents or wholesale dealers, export
warehouse proprietors, or government officials.

The H & H defendants filed the instant motions on June
14, 2018, after the City amended its complaint in response to
defendants' original motions to dismiss.  In separate briefs --
one filed on behalf of Mr. Hatu, *see* Dkt. 34, and another filed
on behalf of H & H and Mr. Hassan, available at Dkt 36 -- these
defendants raise a host of arguments about each of the statutes
implicated here.  At bottom, however, each brief rests
primarily on the argument that the amended complaint fails to
plausibly allege that the H & H defendants knew that the
cigarettes they sold in North Carolina would be transported to
New York.

This argument gives rise to two potential bases for
dismissal:  First, under Federal Rules of Civil Procedure
12(b)(2), that the amended complaint should be dismissed
against the H & H defendants for lack of personal jurisdiction;

i9o2citC

1    and, second, under Rule 12(b)(6), that the amended complaint

2    fails to state a plausible claim against the H & H defendants.

3    I will note parenthetically that although Mr. Hatu does not

4    raise any of his own arguments as to personal jurisdiction, he

5    expressly adopts his codefendants' arguments on that score.

6    *See* Dkt. 34 at 2, n.1.

7          Under these circumstances, where defendants raise a

8    combination of Rule 12 defenses, I am constrained to address

9    the issue of personal jurisdiction first.  For that

10   proposition, I would cite *Backus v. U3 Advisors, Inc.*, 2017 WL

11   3600430 at *10 (S.D.N.Y. Aug. 18, 2017), as well as the Second

12   Circuit's *en banc* decision authored by Judge Friendly, in

13   *Arrowsmith v. United Press International*, 320 F.2d 219, 221 (2d

14   Cir. 1963).

15         With regard to personal jurisdiction, "the plaintiff

16   bears the burden of establishing that the court has

17   jurisdiction over the defendant."  *See DeStefano v. Carozzi*

18   *North America, Inc.,* 286 F.3d 81, 84 (2d Cir. 2001).  The

19   showing that a plaintiff must make to defeat a defendant's

20   claim that the court lacks personal jurisdiction over it varies

21   depending upon the procedural posture of the litigation.  *See*

22   *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197

23   (2d Cir. 1990).  Where, as here, a district court decides a

24   Rule 12(b)(2) motion on the pleadings, plaintiffs need make

25   only a *prima facie* showing of personal jurisdiction.  *See*

*Southern New England Telephone Company v. Global NAPs, Inc.,* 624 F.3d 123, 138 (2d Cir. 2010). In other words, the plaintiff must aver facts that, "if credited, would suffice to establish jurisdiction over the person." *Id.* (citation omitted). The court must "construe the pleadings and affidavits in the light most favorable to the plaintiff, resolving all doubt in its favor." *See Dorchester Financial Securities, Inc. v. Banco BRJ S.A.,* 722 F.3d 81, 85 (2d Cir. 2013). However, the court will not "draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." Citing *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59 (2d Cir. 2012).

In a federal question case such as this, determining whether the court has personal jurisdiction over a foreign defendant requires a two-step inquiry. I cite here a second decision of the Court of Appeals in the *Licci* matter, this one reported at 732 F.3d 161, 168 (2d Cir. 2013). First, the court "looks to the law of the forum state to determine whether personal jurisdiction will lie," or, if a federal statute specifically provides for national service of process, to that statute instead, *see PDK Labs, Inc., v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). Then, if there is a statutory basis for exercising personal jurisdiction, the court must "consider whether the . . . exercise of personal jurisdiction over a

i9o2citC

foreign defendant comports with due process protections established under the United States Constitution."  Citing *Licci*, 732 F.3d at 168; and the ancient case of *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

At the first step of the personal jurisdiction inquiry, the parties agree that RICO provides its own statutory basis for jurisdiction.  *See* 18 U.S.C. § 1965.  They disagree, however, as to which provision of New York's long-arm statute -- Section 302 of New York's CPLR -- governs the balance of the city's claims.  I am going to first address whether a statutory basis for jurisdiction exists under RICO, and then I will proceed to consider CPLR § 302.

18 U.S.C. § 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which the person resides, has an agent, or transacts his or her affairs.  In other words, "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."  Citing *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71 (2d Cir. 1998).  As I will explain shortly, the amended complaint does not establish minimum contacts with respect to the H & H defendants.  That is independently dispositive of the personal jurisdiction analysis from a constitutional perspective.  But for purposes of the statutory analysis, it is not dispositive of whether RICO

provides a basis for jurisdiction.  That is because the court
may assume *arguendo* that the amended complaint establishes
personal jurisdiction over at least one of the other
defendants –– the North Carolina retailers –– who have not
challenged the amended complaint on this or any other ground.

Proceeding on that assumption, Section 1965(b)
provides for jurisdiction over "other parties" not residing in
the district, including codefendants, where the "ends of
justice" so require.  Citing *PT United*, 138 F.3d at 71.  This
limitation reflects RICO's "first preference . . . to bring the
action where suits are normally expected to be brought" rather
than "haling defendants into far-flung fora."  *Id.* at 71-72.
Here there is no question that an alternative forum exists
where personal jurisdiction may be exercised over all
defendants: North Carolina, where all defendants reside.
Accordingly, the City has not established personal jurisdiction
over the H & H defendants under RICO.

With respect to its non-RICO claims, the City also has
not established personal jurisdiction over the H & H defendants
under the CPLR.  CPLR § 302 governs jurisdiction over
non-domiciliaries acting either in person or through an agent.
The parties dispute whether the statutory violations alleged
here implicate CPLR § 302(a)(1) which concerns business
transactions within the state, Section 302(a)(2), which
concerns torts committed within the state, or Section

i9o2citC

302(a)(3), which concerns torts committed outside of the state
which cause injury within the state, where, as relevant here,
the non-domiciliary expected or reasonably should have expected
that the act would have consequences in the state, and also
derives substantial revenue from interstate commerce

The parties' dispute over which provision properly
applies is ultimately academic.  The City has established
jurisdiction under none of these provisions; and that is
because, at bottom, the amended complaint fails to plausibly
allege as a matter of fact that the H & H defendants knew that
any of the cigarettes they sold were destined for resale in New
York.

To reiterate, there is no allegation that the H & H
defendants ever set foot in New York or negotiated with New
York parties.  Instead, as alleged, the H & H defendants
communicated only with each other and with defendant Hamza, a
North Carolina retailer who himself is not alleged to have set
foot in New York.  Thus, for purposes of Sections 302(a)(1) and
(a)(2), jurisdiction will lie only if the H & H defendants
acted in New York through an agent or, as the City would have
it, as part of a conspiracy.  Accordingly, the amended
complaint must support a plausible inference that a member of
the Moflehi Enterprise acted in New York with the "knowledge
and consent" of the H & H defendants, or that the H & H
defendants and their alleged coconspirators in New York acted

with a "common purpose by common agreement or understanding."

Citing *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122-23 (2d

Cir. 1981). Similarly, for the purposes of Section 302(a)(3),

the City must plausibly allege that the H & H defendants knew

or reasonably should have known that their acts would have

consequences in New York. The amended complaint can support

none of these inferences.

The City repeatedly offers the conclusory allegation that

the H & H defendants had "full knowledge that the North

Carolina retailers intended to and did in fact transfer the

cigarettes to the Moflehi Enterprise for distribution and sale

in New York City. *See* Amended Complaint paragraph 41; *Id.*

paragraph 98. The court need not credit allegations such as

these for purposes of a motion to dismiss. The court therefore

puts those allegations to one side, leaving, at most, five

concrete allegations to ostensibly support the inference of the

H & H defendants' knowledge. Even in combination, however,

these allegations cannot support the exercise of personal

jurisdiction.

First, the City points to its allegations concerning the

disparate cigarette taxes in New York and North Carolina. *See*

Amended Complaint paragraphs 7, 27. From these allegations,

the City invites the inference that the H & H defendants knew

that North Carolina cigarettes can be sold for a profit in New

York. *See* Dkt. 55 at 11. But the amended complaint alleges

1    only the fact of a tax disparity, not the H & H defendants'

2    knowledge of that disparity and, in any event, whether

3    individuals knew of an opportunity for profit says almost

4    nothing about whether they knew of others around them taking

5    advantage of that opportunity.

6         Second, the City alleges that the H & H defendants

7    sometimes delivered cigarettes to cars bearing out-of-state

8    plates, including, in at least one instance, plates from New

9    Jersey.  *See* Amended Complaint paragraph 62.  The amended

10   complaint does not allege that the H & H defendants knew that

11   the drivers of these vehicles were involved with the Moflehi

12   Enterprise.  Rather, the City appears to rely on two unstated

13   assumptions: first, that the H & H defendants knew that the

14   vehicles had out-of-state license plates; and, second, that

15   vehicles with out-of-state plates are more likely to deliver

16   goods out of state.  These are not matters of common-sense

17   intuition.  Whether wholesalers typically examine the license

18   plates of delivery vehicles and whether out-of-state license

19   plates should trigger suspicion of illegal smuggling turns on

20   facts that are simply not alleged here.  And further, even if

21   they were, the amended complaint does not allege, and the City

22   has not explained, why these vehicles -- even ones with New

23   Jersey plates -- would be particularly likely to travel to New

24   York as opposed to some other out-of-state forum.

25         Third, the City alleges that, at least occasionally,

1    orders delivered by H & H to the North Carolina retailers'
2    stores would be loaded directly into the retailers' vehicles.
3    *See* Amended Complaint paragraph 63.  This allegation suggests
4    that the H & H defendants knew, at least on certain occasions,
5    that the retailers planned to do something with the cigarettes
6    other than sell them out of the particular stores to which they
7    had been delivered.  But the amended complaint itself alleges
8    that each of the North Carolina retailers owned or was employed
9    by multiple convenience stores in North Carolina.  *See* Amended
10   Complaint paragraphs 7, 19-21.  That the cigarettes were not
11   destined for sale at a particular store, therefore, does not
12   raise a plausible inference that the cigarettes were destined
13   for illegal sale somewhere outside of North Carolina.  And
14   further, even if the allegations did support an inference of
15   illegal distribution outside of North Carolina, they still
16   would not support the inference necessary here: that the
17   cigarettes were intended for New York.  This piece of evidence
18   does not point, at all, to New York.

19        Fourth, the amended complaint describes a phone call
20   between Mr. Hatu and Mr. Hassan in which Mr. Hatu informed
21   Mr. Hassan that earlier in the week, "Mussa and Akram's guy"
22   had been "robbed on the highway" of 6,000 cartons of
23   cigarettes.  Mr. Hatu then told Mr. Hassan that "they" had also
24   been "hit" for $90,000 six months ago by the same two
25   "robbers."  Mr. Hatu and Mr. Hassan then agree that "they"

1   "probably need to get new car and find a different way to go."

2   *See* Amended Complaint paragraphs 55-61.

3       The City understands this back-and-fork as coded dialogue

4   referring to the operations of the Moflehi Enterprise.  To wit,

5   the City alleges that Mussa and Akram are defendants Mussa

6   Hamza and Akram Shamakh; that the "robbery" they referred to

7   was an episode one week prior to the phone call in which two

8   transporters had their cargo of cigarettes seized by the NYPD

9   in New York City; that "they" are transporters in the Moflehi

10  Enterprise; and that the "hit" was an episode four months prior

11  in which the NYPD seized $100,000 from one of the Moflehi

12  Enterprise's transporters.  *See* Amended Complaint paragraph

13  59-61.

14      There are two problems with this pleading as a basis for

15  establishing personal jurisdiction in New York.  First, even

16  granting that Mr. Hatu was relating a story told to him by

17  Mr. Hamza, this conversation referring to a "robbery" does not

18  suggest that the H & H defendants understood themselves to be

19  involved with interstate smuggling.  True, the City alleges

20  that Mr. Hatu and Mr. Hassan discussed how the "loss of income

21  from the seized product would make things different for them."

22  Amended Complaint paragraph 61.  But even if "them" in that

23  sentence refers to Hatu and Hassan, which is not altogether

24  clear, a robbery affecting one of their retail clients

25  naturally would affect ongoing business with that client.  A

i9o2citC

1    pattern of robberies of the product by robbers, as opposed to

2    seizures by law enforcement, would also be of concern to H & H.

3    And the word "robbery" is quite an inexact formulation for a

4    person referring to a seizure by law enforcement.  The use of

5    that term may suggest, if anything, that the H & H defendants

6    were deliberately told a false cover story about a robbery to

7    account for the loss of the product, because it was

8    disadvantageous to tell them that the people with whom they

9    were doing business were in fact interstate smugglers.  Such

10   knowledge might have scared them away from continued sales,

11   lest they run the risk of criminal prosecution or the sort of

12   enforcement action pursued here.  While it is certainly

13   possible that the word "robbery" was understood by the H & H

14   defendants to refer to a seizure of contraband by law

15   enforcement, that proposition is, on the pleadings, no more

16   than speculative.

17        Second, and more important, nothing in the alleged

18   conversation refers to New York.  It does not situate the

19   "robbery" in New York, or indeed outside of North Carolina.

20   Even assuming that the "robbery" were taken as a proxy for a

21   seizure of the cigarettes by law enforcement agents

22   investigating interstate smuggling, on the facts pled, the

23   seizure could have been by law enforcement anywhere.  It is

24   speculative to contend that the H & H defendants, in being told

25   about a "robbery," were told that the robbery, actually a

1    seizure, occurred in New York or related to smuggling in New

2    York.  Plaintiffs do not explain why it logically follows that

3    the H & H defendants would have been told the situs of the

4    purported robbery.  This episode thus does not demonstrate the

5    H & H defendants' knowledge of goings-on in New York

6    specifically.

7         Fifth, and finally, the City offers a lengthy analysis

8    concerning the relative popularity of certain brands of

9    cigarettes in New York City as compared to North Carolina.  See

10   Amended Complaint paragraphs 65-87.  In short, the City alleges

11   that Newport cigarettes are trafficked into New York City more

12   often than any other brand, and that Marlboro is the most

13   popular cigarette in North Carolina.  The City draws from this

14   data the inference that a *bona fide* North Carolina wholesaler

15   would sell more Marlboros than Newports, whereas a seller

16   hoping to target New York would sell more Newports.  H & H, the

17   City alleges, sold considerably more Newports than Marlboros.

18        To its credit, the City recognizes in its opposition

19   brief that these allegations cannot support an inference about

20   the H & H defendants' knowledge.  *See* Dkt. 55 at 12-13.

21   Rather, the City argues, these statistics raise a plausible

22   inference that the cigarettes provided by H & H were in fact

23   destined for New York City.  That point, however, is immaterial

24   to the present analysis, which turns on the H & H defendants'

25   knowledge.  Nevertheless, I note that I have some doubts even

i9o2citC

about the plausibility of the City's inference.  As the City

concedes, its data do not discriminate among different

sub-markets in North Carolina.  Brand preferences in those

sub-markets may differ substantially from those obtaining in

North Carolina as a whole.  And indeed, plaintiffs contends

that Newports are considerably more popular than Marlboros in

the particular sub-market that H & H services.  If that is so,

this market-specific information would largely account for

H & H's seemingly unusual sales portfolio.  Further, even if

H & H's sales were more consistent with sales to New York City

than the relevant sub-market, that fact says nothing about the

likelihood that H & H's sales actually proceeded to New York

City as opposed to other markets with similar cigarette

preferences.  In the end, in any event, I will not linger on

this point given that the City concedes that these allegations

do not support an inference to the as to the H & H defendants'

knowledge.

    Having reviewed all of these allegations, I conclude that

the amended complaint cannot support an inference that the

H & H defendants knew of any activity in New York, whether for

purposes of CPLR Section 302(a)(1), (a)(2), or (a)(3).  To be

sure, the City's allegations must be taken in concert, rather

than dissected piecemeal.  But even stacking this series of

weak inferences together does not give rise to a plausible

inference of knowledge as to events in New York.  Accordingly,

1   there is no basis for statutory jurisdiction here

2           The foregoing is sufficient to inter the City's claims

3   against the H & H defendants.  Nonetheless, for the sake of

4   thoroughness, I will now explain why the exercise of

5   jurisdiction also would not comport with due process.

6           Where, as here, the plaintiff asks the court to assert

7   specific jurisdiction over foreign defendants, the due process

8   inquiry consists of two components: the "minimum contacts"

9   inquiry and the "reasonableness" inquiry.  *See Licci* 673 F.3D

10  at 60.  The minimum contacts inquiry asks whether a defendant

11  has engaged in "purposeful availment" -- that is, whether the

12  defendant's contacts demonstrate an intent to invoke the

13  benefits and privileges of the forum's law, such that the

14  defendant should reasonably anticipate be haled into court

15  there.  *See Burger King* Corp. v. *Rudzewicz*, 471 U.S. 462,

16  472-75 (1985).  The second part of the due process analysis

17  asks "whether the assertion of personal jurisdiction comports

18  with traditional notions of fair play and substantial

19  justice -- that is, whether it is reasonable under the

20  circumstances of the particular case."  *Bank Brussels Lambert*

21  *v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 129 (2d Cir.

22  2002).

23          The City fails at the first step.  In evaluating whether

24  the defendant has purposefully established minimum contacts,

25  the court looks to the "quality and nature" of the defendant's

i9o2citC

contacts under the totality of the circumstances. *See Best Van Lines v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King* 471 U.S. at 475). "Random, fortuitous, or attenuated contacts" will not suffice to confer jurisdiction nor will "the unilateral activity of another party or third person," citing *Burger King* at the same page. Likewise, that a defendant might foresee injury in the forum state is insufficient. *Id.* at 474. Rather, the defendant must have "purposefully directed" efforts towards another state, such that he could foresee being haled into court there. *Id.* at 476.

As I have explained, the amended complaint doesn't give rise to a plausible inference that the H & H defendants knew that they were taking place in a cigarette bootlegging enterprise. It follows *a fortiori* that they did not purposefully direct their conduct at New York. There is no plausible allegation that the H & H defendants purposefully availed themselves of New York by "directing their agents" to operate in New York. *Charles Schwab Corp.*, 883 F.3d 68, 86 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 135 n. 13 (2014)). Nor is there any plausible allegation that these defendants agreed to participate in a conspiracy such that their alleged coconspirators' contacts with New York might suffice to confer jurisdiction. *See Id.* at 87. And finally, the City may not rely on the "effects test" theory of personal jurisdiction

i9o2citC

1    under which "the conduct that forms the basis for the

2    controversy occurs entirely out-of-forum, and the only relevant

3    jurisdictional contacts with the forum are therefore in-forum

4    effects harmful to the plaintiff. *Licci*, 732 F.3d 173. Under

5    that theory, the City would have to plausibly allege

6    "intentional . . . actions expressly aimed at" New York.

7    *Calder v. Jones*, 465 U.S. 783, 789 (1984). As I have

8    explained, the H & H defendants' conduct here, as alleged, did

9    not rise to the level of knowing, let alone intentional,

10   activity directed at New York.

11       At bottom, the City has not plausibly alleged that the

12   H & H defendants purposefully directed conduct at New York.

13   For that reason, the City has not established the H & H

14   defendants' minimum contacts with New York. Accordingly, the

15   City may not exercise jurisdiction over those defendants

16   consistent with due process. The case must therefore be

17   dismissed as against those defendants.

18       Now, a dismissal for want of personal jurisdiction is

19   without prejudice. *See Smith v. United States*, 554 F.App'x 30,

20   32 (2d Cir. 2013). This dismissal, therefore, is without

21   prejudice to the city's right to bring renewed claims against

22   the H & H defendants, should the City be able to fortify its

23   jurisdictional allegations. I note, however, that as currently

24   pled, at least three of the city's claims against the H & H

25   defendants would have failed to state a plausible claim for

i9o2citC

1   relief.  That is so much for the same reasons that I have
2   reviewed in connection with personal jurisdiction.  The CCTA on
3   which plaintiffs' RICO and RICO conspiracy claims are
4   predicated requires as an element the knowing distribution of
5   contraband cigarettes:  "It shall be unlawful for any person
6   knowingly to ship, transport, receive, possess, sell,
7   distribute, or purchase contraband cigarettes or contraband
8   smokeless tobacco."  18 U.S.C. 2342(a).  And for the reasons I
9   have just stated, the City has not adequately pled the H & H
10  defendants' knowledge that the cigarettes they distributed were
11  destined to be contraband.  Accordingly, the City's allegations
12  could not have supported liability under the CCTA or RICO.  It
13  is somewhat less clear whether, under the circumstances here,
14  the City's claims for violations of the PACT Act and PHL
15  require proof of knowledge on the H & H defendants' part.
16  Because I have dismissed for lack of personal jurisdiction,
17  however, I need not and will not resolve that question.  It is
18  enough, for now, that the amended complaint is dismissed
19  without prejudice as against the H & H defendants.
20       With that, the bench decision is concluded, and we will
21  proceed with an initial pretrial conference.
22       I am going to take about a five-minute recess, and I will
23  ask counsel for the remaining parties to confer about a case
24  management plan now that you are aware of the somewhat reduced
25  number of players.

i9o2citC

1      When I come out, I will be asking you broadly what the

2  time frame for discovery ought to be.  Ordinarily I expect

3  parties to get discovery done in about four months, and this

4  case does not sound, as narrowed, particularly out of the

5  ordinary.  I will also want to get a sense of whether there are

6  going to be any particular challenges that discovery presents.

7  I am eager to hear the extent to which you have met and

8  conferred about the content of discovery.  We will talk about

9  issues like that, about referring the case to the magistrate

10  judge for settlement purposes, and the like.  I am eager to

11  understand what people think the likely trajectory of the case

12  is with respect to the remaining parties.

13      I will see you in five minutes.

14      (Recess)

15      (Mr. Hugel, Ms. Corcoran, and Mr. Murphy not present)

16      THE COURT:  Counsel, have you had a chance to confer?

17      Let me begin with plaintiff.  Tell me what discovery

18  from your perspective is going to be important in the context

19  of this case.  I think I understood the allegations well.

20  Kindly speak into the mike.  Thank you.

21      MR. PROSHANSKY:  I think the discovery would be the

22  usual, that is, documents, interrogatories, and depositions.

23      THE COURT:  I understand the category level.  Those

24  are what you have a right to.  Whose testimony, what records

25  really is this going to turn on?

i9o2citC

1          MR. PROSHANSKY:  We want the testimony of each of the

2     three defendants and, by virtue of the other discovery, perhaps

3     be able to identify other people who work with them and so

4     forth whose testimony we might want.

5          THE COURT:  Is this the sort of case where e-discovery

6     is really a big deal or not really?

7          MR. PROSHANSKY:  I don't believe so.  It depends on

8     how much discovery the defendant wants from the City.

9          THE COURT:  I wouldn't have thought so, but I don't

10    know.  If that is the case, then, there certainly oughtn't be

11    any problem in your getting discovery accomplished in four

12    months.

13         MR. PROSHANSKY:  We were speaking, and we believe that

14    we could sign up for the standard time periods that your CMO

15    offers.

16         THE COURT:  I'm not completely unreasonable if you

17    bump into problems; but as a first bid, I would like to try to

18    keep it like that.

19         MR. PROSHANSKY:  I think the one potential obstacle is

20    Mr. McMahon has a trial that will intervene with this, as

21    actually do I beginning in October.  It might be helpful --

22         THE COURT:  Mr. McMahon, I take it you have got an

23    issue with this?

24         MR. McMAHON:  I do, your Honor.  Although I preface it

25    by saying that e-discovery is not going to be an issue and it

i9o2citC

1  is going to be fairly straightforward discovery, but I think

2  the documents that I need to review will be voluminous.

3          THE COURT:  How so?

4          MR. McMAHON:  Well, I think it involves all of the

5  underlying criminal investigation, the context leading to the

6  wiretaps, the text messages, and the surveillances apparently

7  of the North Carolina retailers.  So it seems to me there is a

8  whole lot of police reports and --

9          THE COURT:  I take it there is no dispute among you as

10  to your entitlement to that material, right?

11          MR. McMAHON:  Right, right.

12          THE COURT:  Has that been the source of discovery in

13  some other prior criminal case?

14          MR. McMAHON:  Yes, Judge.  There was this pending

15  prosecution in the Bronx.

16          THE COURT:  But, in other words, the material you have

17  just described has substantially already been distributed to

18  other people in that case.

19          MR. McMAHON:  It has been distributed to the City,

20  which was actually a bone of contention in the motion papers

21  as --

22          THE COURT:  Right.

23          MR. McMAHON:  -- to whether the Bronx District

24  Attorney can be turning over wiretap material.  It hasn't come

25  to me.

1    THE COURT:  But that is a -- that may or may not be a

2    motion down the road, right.  So Mr. Proshansky, do you have a

3    sense, because Mr. McMahon hasn't laid his hands on this

4    material, what's your sense of the scale of it all?

5    MR. PROSHANSKY:  Well, I think there is a considerable

6    amount of material that is held by the Bronx District Attorney.

7    I don't know the full extent of it.  I know what I have, and

8    what I have is not that extensive.  Much of it is described in

9    the complaint.

10    THE COURT:  But you understand that you have got an

11    obligation to go and get that material from the Bronx DA as

12    opposed to picking and choosing from his file what you choose

13    to take?

14    MR. PROSHANSKY:  Absolutely.

15    THE COURT:  Are there going to be any issues prying

16    that loose from the Bronx DA?

17    MR. PROSHANSKY:  I don't believe so, but obviously I

18    can't speak on their behalf.  But they have been relatively

19    generous in turning over --

20    THE COURT:  Please let them know that the court

21    expects them to promptly cooperate with you.  This is an

22    important case that's been around for a little while.  I want

23    to make sure that we start moving it now that the motion to

24    dismiss has been resolved.  So please underscore to them that I

25    appreciate but also expect their cooperation.

1        I guess the real money question is how quickly do you

2    think you can get that discovery to Mr. McMahon?

3        MR. PROSHANSKY:  Well, I will contact the Bronx

4    District Attorney and find out the answer to that.

5        THE COURT:  Well, a little more than that.  I would

6    like you to say that the judge expects them to get it to you

7    within what, two weeks, something like that.  It seems to me

8    that we have known this was coming.  There was only Mr. McMahon

9    didn't move to dismiss, so we knew at a minimum that the two of

10   you were going to be standing here about now having this

11   conversation.  I would have expected you would have already put

12   in place, frankly, a procedure for getting that discovery from

13   them since this moment was inevitable.  I would like you to get

14   it all from them within two weeks.

15       MR. PROSHANSKY:  Okay.

16       THE COURT:  I don't think I am being unreasonable, but

17   the case doesn't get any better if we wait.

18       MR. PROSHANSKY:  I will make that request to them.

19       THE COURT:  Mr. McMahon, assuming there is cooperation

20   with that, is there any problem with situating fact discovery

21   within about a four-month period?

22       MR. McMAHON:  Yes, Judge, and Mr. Proshansky alluded

23   to it.  He is starting a civil trial on October 9 that he can

24   address.  I think it is in this building as well.  I have a

25   February 18 trial before Judge Hellerstein, a multi-defendant

i9o2citC

1   Mafia case in this building, but I am just in the process of

2   substituting in as counsel on a case before Judge Abrams in

3   this building, a terrorism case, in which a firm trial date of

4   December 3 has been set.  It would be my hope to get Judge

5   Abrams to push that trial, but the government previously --

6   counsel for the defendant was Federal Defenders, and they had

7   made a previous application for an adjournment of the trial,

8   and the government vigorously opposed it.  The application was

9   granted although, as I say, vigorously defended.  So while I'm

10  hopeful that the December 3 date may be adjourned, I cannot

11  count on that.  So having said that, so that would be a

12  December 3 date which I would be scrambling like crazy to get

13  ready for that trial, and then, as I said, the February 18

14  trial.

15          Be that as it may, Judge, if we could perhaps add two

16  months on to your four-month normal expected --

17          THE COURT:  If I do that, I'm going to make a note in

18  our record that you really should not expect any further

19  adjournments.  In other words, I will give you the extra time

20  now.  I understand -- I am well familiar with you from prior

21  life -- how hard you work and that you are in demand and you

22  have a small shop, so I respect all that.  At the same time, I

23  don't want to be the victim of, you know, you have got to play

24  the card you have got the case in front of Judge Engelmayer in

25  this courthouse for the next thing that comes down the road.

i9o2citC

1      MR. McMAHON:  Yes, Judge.  I would not anticipate

2   making another request.

3      THE COURT:  So here is what I would like you to do.

4   Why don't you get me a case management plan that sets an end

5   date for fact discovery plus or minus a couple of days six

6   months from now.  So today is September 24, plus or minus a

7   couple of days, choose a Friday, choose a Monday, but within

8   about six months of -- within a few days of March 24 should be

9   the end date for fact discovery.  It's for you to set within a

10  six-month parameter the various dates for subsets of fact

11  discovery, initial disclosures and the like.  I am happy for

12  you to work that out as professionals together.  But let's say

13  by the end of the day tomorrow get me a case management plan

14  that plugs in dates consistent with what I have just said.

15      Under my individual rules, if anyone intends to move

16  for summary judgment, two weeks after the close of fact

17  discovery you have got to get me a three-page, single-spaced

18  letter previewing the summary judgment motion, and the other

19  side has a week to respond.  We would then meet a week or two

20  later, about four weeks after the close of fact discovery.

21      Let me get a date right now from Mr. Smallman.  That's

22  about four weeks after March 24 or so.

23      (Pause)

24      THE COURT:  How about April 24 at 10:30?  Motions for

25  summary judgment are the only category of motions as to which I

 1     require a premotion conference, but my experience has been that

 2     those conferences are tremendously useful.  Sometimes the

 3     motion simply goes away because there was a material dispute of

 4     fact and the exchange of letters or our conversation makes that

 5     obvious.  Very often, even when the motion is destined to be

 6     made, the fact that we spend a half hour, 45 minutes together

 7     just results in my getting a much sharper, better organized set

 8     of papers.  I can also often work with counsel to get you to

 9     agree to joint stipulated facts in which essentially you agree

10     to 75, 80 or more percent of the facts at issue and leave for

11     your 56.1 statements and oppositions really the only narrow

12     minority of facts or alleged facts that are in dispute.  That

13     saves you a ton of time and organizes the facts nicely for me

14     and my staff.  And frankly, just my involvement in that

15     discussion with you sometimes helps spot issues that you ought

16     to address either because they are genuine issues or because I

17     am just confused, but you will need to disabuse me of whatever

18     I am confused about.

19             So for all those reasons, we will meet again on April

20     24 at 10:30, and you should write that in to the case

21     management plan.

22             Mr. Proshansky, are you anticipating any unusual

23     challenges with the case, anything out of the ordinary,

24     anything I need to attend to in this conference?

25             MR. PROSHANSKY:  No, your Honor.

1          THE COURT:  How about you, Mr. McMahon?

2          MR. McMAHON:  No, your Honor.

3          I would alert the court to the fact that

4   Mr. Proshansky and I spoke while your Honor was in recess, and

5   we are going to have settlement discussions.  I don't think at

6   this point we need a magistrate to be involved.  It's a matter

7   of meeting and conferring with my clients.  But there is

8   significant conversations being had on that front.

9          THE COURT:  Good.  I am delighted to hear that.  Let

10  me propose the following.  Let me refer this to the magistrate

11  judge for settlement purposes, but I will make the notation on

12  the referral form, as I often do, that there is not to be any

13  conference scheduled until both parties are ready.  So it's a

14  resource that you together can take off the shelf without

15  having to badger me or delay.  And I will make the notation

16  that I always do which is that it is on plaintiff's counsel to

17  reach out to the magistrate judge to the scheduling on both of

18  your behalves, but only when you are both ready.  So that way

19  if I can't be reached or you just want to get on the magistrate

20  judge's calendar, agree to it together, make a phone call.

21          MR. McMAHON:  Okay.

22          MR. PROSHANSKY:  Yes your Honor.

23          THE COURT:  Mr. McMahon, I am delighted to hear that.

24  I don't prejudge the facts of the case, but taking a look at

25  the case, the volume of discovery and whatnot, I can certainly

i9o2citC

1    see where there would be economic wisdom to both sides to

2    pursuing a settlement.

3              MR. McMAHON:  Yes.

4              THE COURT:  All right.  Thank you.  We stand

5    adjourned.  Tomorrow just get me the case management plan.

6              MR. PROSHANSKY:  Will do.

7                           oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25