Issue Date: November 30, 2015

# PHILIP MORRIS USA INC.
## WHOLESALE LEADERS 2016 PROGRAM
## PARTICIPATION AGREEMENT

**This Participation Agreement ("Agreement"), by and between Philip Morris USA Inc., a Virginia corporation ("PM USA"), and the party identified below ("Participant"), effective as of January 3, 2016 sets forth the terms and conditions of the PM USA Wholesale Leaders 2016 Program (the "Program"). The following exhibits, which PM USA may amend at any time, are a part of the Agreement: (i) Exhibit A – Performance Measures and Information and (ii) Exhibit B – PM USA STARS Tobacco Products Reporting Package.**

**Participant Information.**

| | | |
|---|---|---|
| Territory #: | Participant Name: | |
| HQ MA #: | Street Address: | |
| Agreement Effective Date: | Payment Address: | |
| | E-mail Address: | |

**Owner Information.** Please enter Participant owner information below. If you check "Individual," provide Individual Full Name. If you check "Entity," provide Entity Full Name.

☐ **Individual** ☐ **Entity (e.g., corporation, partnership, or limited liability company)**

Individual Full Name:_____(only for Individual)

Entity Full Name:_____(only for Entity)

Street Address: _____

City, State, ZIP: _____

Telephone Number: _____

**Contacts.**

| | | | |
|---|---|---|---|
| Contact for Data Compliance: | | Contact for State License Compliance: | |
| Data Contact Phone #: | | License Contact Phone #: | |
| Data Contact E-Mail Address: | | License Contact E-Mail Address: | |

**Participant's Sites.** Please list each Site (location from which Participant ships or permits to be removed Tobacco Products).

| Site MA# | Name, Physical Address | PM USA Direct-Buying Location? |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Issue Date: November 30, 2015

**Affiliated Distributors/Retailers and Distributors with Which Participant Has Agreements.** Please list (i) all Distributors or retailers that are Affiliates of Participant or with which Participant or Participant's principals has any other type of affiliation, including by way of a non-Controlling interest, whether directly or indirectly through another Person, (including each location from which any such Distributor or retailer ships or permits to be removed Tobacco Products) and (ii) Distributors with which Participant has any agreements (oral or written) directly or through any Affiliate regarding the tax stamping, ordering, billing, delivering, warehousing, receiving of returns, promotion assembling, or other handling of Tobacco Products. Describe the nature of the affiliation or agreement.

| MA or RC# | Name and Address | Distributor or Retailer? | Nature of Relationship/Agreement | Owner/Partner |
|-----------|------------------|--------------------------|----------------------------------|---------------|
|           |                  |                          |                                  |               |
|           |                  |                          |                                  |               |
|           |                  |                          |                                  |               |
|           |                  |                          |                                  |               |

**Participant's Owners, Officers, Directors, and Senior Managers.** Please list each of Participant's owners, if applicable, officers and directors, and Participant's senior managers principally responsible for Participant's performance under this Agreement. If Entity is selected in Owner Information above, list Participant's chief executive officer first.

| Full Name: | | Title: | |
|------------|--|--------|--|
| Full Name: | | Title: | |
| Full Name: | | Title: | |
| Full Name: | | Title: | |
| Full Name: | | Title: | |

**Criminal Indictments and Convictions.** If Participant, or any of its officers, directors, or owners with Control have been indicted or convicted, whether by trial or by plea agreement, of a criminal offense related to the sale or distribution of Tobacco Products, between January 1, 2011, and the present, please list the following for each such indictment or conviction: full name of individual/entity indicted or convicted, date of indictment or conviction, underlying criminal charge, relevant court and jurisdiction, case number, and resulting fine or sentence, if applicable. Please indicate whether any conviction has been appealed, and if so, the status or result of the appeal.

_____

_____

**Remote Sales of PM USA Products.** Please indicate whether (i) Participant, (ii) any Affiliated Distributor or retailer, (iii) any Distributor with which Participant has agreements as set forth above, or (iv) any officer, director, or owner with Control of (i), (ii) or (iii) is engaged in the sale or distribution of PM USA Products over the Internet or by telephone or mail order. For any such Person, please provide the full name, physical address of the business and the Internet address, if applicable.

_____

_____

Issue Date: November 30, 2015

**By its signature below, Participant:**

1) represents that it has taken all action necessary to, and is authorized to, enter into and sign this Agreement and that neither the execution of this Agreement nor the performance of Participant's obligations under this Agreement will conflict with, or result in a breach of, any other contract;

2) acknowledges and agrees to the terms and conditions of this Agreement, including all Exhibits referenced in and attached to this Agreement;

3) agrees that this Agreement will not become binding on PM USA unless and until this Agreement is approved by PM USA, as indicated by the signature of an authorized AGDC representatives below;

4) agrees to receive notices and other communications contemplated by this Agreement electronically; and acknowledges and agrees that PM USA may, in its sole discretion, provide some or all notices and other communications to Participant via electronic mail to the e-mail address listed above; and

5) certifies that all employees who meet with Customers that sell Tobacco Products have completed We Card training produced by We Card Program, Inc. and have been trained on how to supply those Customers a We Card order form within the 12 months before the Effective Date of this Agreement.  Participant further agrees that all new employees who meet with Customers that sell Tobacco Products will complete We Card training within 90 days after beginning employment and that Participant will provide training to all employees who meet with Customers that sell Tobacco Products at least once annually.

**This is an electronically executed agreement, which means that the electronically executed document is the original and legally binding agreement between PM USA and Participant.  Any paper version, even if signed, should be regarded only as a courtesy copy.  In case of a conflict between the electronically executed document and any paper version, the electronically executed document controls.**

**Participant (Must be signed by an authorized representative)**        **Philip Morris USA Inc.**
                                                                       **By:  Altria Group Distribution Company Inc.**

By: _DO NOT SIGN_____          AGDC Account Manager: _DO NOT SIGN_____

Printed Name: _____          Printed Name: _____

Title: _____          Date: _____

Date: _____          Approving Manager: _DO NOT SIGN_____

                                                            **AGDC Section Sales Director**

                                            Printed Name: _____

                                            Date: _____

## I.      DEFINITIONS.

The following capitalized terms used in this Agreement are defined terms that have the following meanings:

**"Accelerated Payment Option"** means the optional Payment Terms and associated incremental terms rate discount pursuant to which Participant may elect to purchase PM USA Products as set forth in Part X.D.

**"APO Percentage"** means the Accelerated Payment Option percentage or an incremental terms rate discount on PM USA Products set forth in Exhibit A.

**"Affiliate"** means a Person that for any purpose directly or indirectly Controls, is Controlled by, or is under common Control with, another Person.

**"Affiliated"** means the relationship between Affiliates.

**"Affiliation/Site Determination Date"** means the day of each Quarter designated by PM USA in Exhibit A.  By the Affiliation/Site Determination Date, PM USA will confirm Participant's Sites and Related Distributors for purposes of making PM USA Share and Payment calculations under Part VII., Part VIII., and Part IX.

**"ALCS"** means Altria Client Services Inc., a New York corporation and an Affiliate of PM USA.

**"AGDC"** means Altria Group Distribution Company Inc., a Virginia corporation and an Affiliate of PM USA.

**"Cents Per Cigarette Carton Rates"** means any of the rates at which Participant may earn Payments, as set forth in Part V.B. and Part IX.C., and in Exhibit A.

**"Cents Per Non-Cigarette Product Unit Rate"** means the rate at which Participant may earn Payments for PM USA Non-Cigarette Products (e.g., carton or roll), as set forth under Part IX.G., and in the Payment Grid in Exhibit A under the heading "PM USA Non-Cigarette Products".

**"Change in Control"** means with respect to a Person (i) a change in 50% or more of the membership of the Person's board of directors during any two-year period; (ii) a change in beneficial ownership by any Person or group of 15% or more of the outstanding voting securities of the Person during any two-year period; (iii) a merger, consolidation, liquidation, or dissolution of the Person in which the Person is not the survivor; or (iv) any other change in the Control of the Person.

**"Classification"** means the identification of a Customer as an MSA Retailer, MSA Distributor, or MSA Other.

**"Control"** means possession of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or partnership or limited liability company interests, by contract or otherwise.  In the case of a corporation, any of the following items may be deemed to confer Control: (i) the direct or indirect ownership of 15% or more of a corporation's outstanding voting securities, it being understood that the direct or indirect ownership of a lesser percentage of shares will not necessarily preclude the existence of Control; or (ii) the ability otherwise to elect a majority of the board of directors of the entity.   An immediate family relationship (father, mother, brother, sister, husband, wife, son, daughter) may be deemed to create a relationship of Control between two individuals or between two entities Controlled by immediate family members.

**"Control Totals"** means the sum of Outbound Shipments and the sum of Inventory, each as reported on the MSA Confirmation.

**"Customer"** means any Person or location that receives Outbound Shipments from a Distributor for the purpose of resale.

**"Data"** means information required to be reported by Participant to MSA in accordance with Part II.A.

**"Direct-Buying Site"** means a Site that purchases or receives Tobacco Products directly from PM USA.

**"Direct Distributor"** means any Distributor that purchases Tobacco Products directly from PM USA.

**"Distribution Services"** means services, including order processing, picking and delivery of PM USA Cigarettes. For purposes of this definition "delivery" means the movement of PM USA Cigarettes by Participant from a Direct-Buying Site to a Customer's place of business.

**"Distributor"** means any Person, including a Direct Distributor or NDD, that sells Tobacco Products to a Customer for the purpose of resale.

**"E-Order Ship List"** means a list of Supplemental Product Orders from retail Customers transmitted by e-mail or fax to a Site by AGDC on behalf of such retail Customers as part of the Supplemental E-Ordering Process.

**"14-Day Resubmission Deadline"** means 5 p.m. (Eastern Time) on the date that is 14 days after the Reporting Week Deadline for each Reporting Week.

**"Grace Period"** means the period of time allotted to Participant described in Part XI.

**"Industry Qualified Shipments"** means the result of the calculation in Part VII.A.2.

**"Introductory Period"** means, with respect to a New Offering or seasonal offering, the period of six months (or such other duration as designated by PM USA) after the first retail delivery date for such offering.

**"Inventory"** means the quantity of all Saleable Tobacco Products in the possession or under the control of Participant, a Site, or a Related NDD at the close of business on the last day of each Reporting Week.

**"Manufacturer"** means a manufacturer or importer of Tobacco Products.

**"MSA"** means Management Science Associates, Inc., PM USA's designated representative for the receipt and processing of Data submissions under this Agreement.

**"MSA Confirmation"** means MSA's written confirmation to Participant of MSA's receipt of Data for any Reporting Week.

**"MSA Distributor"** means a Person that buys Tobacco Products from Manufacturers or other Distributors and is in the business of re-selling those Tobacco Products to retailers or other Distributors.

**"MSA Other"** means a Person that is classified neither as MSA Retailer nor MSA Distributor.

**"MSA Retailer"** means a Person that operates a business within a permanent commercial structure, that is (i) open to the public, for the purpose of face-to-face retail sales of a wide variety of consumer products and (ii) reported to MSA with a valid physical address for such permanent commercial structure.

**"NDD"** means a non-Direct Distributor (*i.e.*, a Distributor that does not purchase Tobacco Products directly from PM USA).

**"New Customer"** means a Customer to which Participant has not previously supplied PM USA Products.

**"New Offering"** means a product, brand or packing that PM USA has not previously made available for distribution with respect to a State or other limited geography.

**"New Participant"** means a Direct Distributor that has not previously participated in a PM USA Wholesale Leaders Program.

**"Non-Eligible Customer"** means any Person that PM USA has categorized as "not eligible" that receives Outbound Shipments.

**"Non-Payable Terms"** has the meaning in Part X.A.8.

**"Non-Reporting NDD"** means an NDD that (i) four or more times during a Quarter, either does not submit Data, or submits inaccurate Data, for a Reporting Week by the Reporting Week Deadline and (ii) does not submit or correct such Data by the Quarterly Resubmission Deadline.

**"Non-Saleable PM USA Products"** means PM USA Products that are (i) damaged or (ii) designated by PM USA as unsuitable for sale.

**"Outbound Shipments"** means all Tobacco Products that a Distributor ships, or permits to be removed, regardless of whether such products are subsequently returned.

**"Participant"** means the party to the Philip Morris USA Inc. Wholesale Leaders 2016 Program Participation Agreement identified above.

**"Payment"** means the total amount payable to Participant under Part IX.

**"Payment-Eligible Outbound Shipments"** means the result of the calculations in Part IX.F. and Part IX.G.

**"Payment Grid"** is the "Wholesale Leaders Payment Grid" in Exhibit A.

**"Payment Terms"** means the number of business days between the date on which ALCS debits payment for PM USA Products from Participant's bank account and the expected delivery date of such products.

**"Performance Level"** means Performance Level 1, 2 or 3, pursuant to Part IX.B.

**"Person"** means an individual, corporation, partnership, limited liability company, joint venture, association, trust or other legal entity.

**"Physical Inventory"** means a physical count of Inventory.

**"PM USA Cigarettes"** means cigarettes which are sold by PM USA and intended for resale in the United States domestic market or United States Military outlets, as specified by PM USA.

**"PM USA Discount Brands"** means the following brands of PM USA Cigarettes: Basic, Cambridge, Dave's and L&M, or as otherwise communicated by PM USA.

**"PM USA Non-Cigarette Products"** means non-cigarette products sold by PM USA and intended for resale in the markets designated by PM USA.

**"PM USA Premium Brands"** means the following brands of PM USA Cigarettes: Benson and Hedges, Chesterfield, English Ovals, Lark, Marlboro, Merit, Parliament, Players, Rothmans, Saratoga and Virginia Slims, or as otherwise communicated by PM USA.

**"PM USA Products"** mean PM USA Cigarettes and PM USA Non-Cigarette Products.

**"PM USA Qualified Shipments"** means the result of the calculation in Part VII.A.1.

**"PM USA Share"** means PM USA's percentage of shipments of all Manufacturers' cigarettes, as calculated pursuant to Part VII.A.

**"PM USA Share Change"** means the difference between (i) Participant's PM USA Share during the current Quarter and (ii) Participant's PM USA Share during the same Quarter of the prior year, as calculated pursuant to Part VIII.A.

**"PM USA Share Target"** means, for each State, the target PM USA Share designated by PM USA in Exhibit A.

**"PM USA Terms and Conditions of Sale"** means the rules that govern the sale of PM USA Products that Participant must comply with in order to purchase directly from PM USA.

**"PM USA Trade Policies"** means PM USA policies applicable to contraband PM USA Products, and remote sales (Internet, telephone and mail order) of PM USA Products, as such policies may be issued or modified by PM USA from time to time.

**"Product Related Initiative"** means a PM USA Promotion, New Offering or seasonal offering.

**"Promotion"** means any promotional program offered by PM USA on PM USA Products.

**"Promotional Product"** means PM USA Products allocated by PM USA to Customers under a Product Related Initiative.

**"Purchase Allowance"** means an allowance from the list price of a PM USA Non-Cigarette Product set forth on the Payment Grid in Exhibit A.

**"Quarter"** means a STARS Calendar quarter.

**"Quarterly Resubmission Deadline"** means 5 p.m. (Eastern Time) on the date that is 14 days after the Reporting Week Deadline for the last Reporting Week of each Quarter.

**"Related Distributor"** means a Distributor that is (i) an Affiliate of Participant, or (ii) for purposes of calculating PM USA Share PM USA deems to be related to Participant as confirmed in a written notice delivered by PM USA under Part XV.C.

**"Related NDD"** means an NDD that is a Related Distributor.

**"Reporting Week"** means the seven-day period commencing on Sunday and ending on Saturday.

**"Reporting Week Deadline"** means 5 p.m. (Eastern Time) on the Wednesday immediately following each Reporting Week. If Monday is a PM USA holiday, the deadline is 12 p.m. (Eastern Time) on the Thursday immediately following such Reporting Week.

**"Retail Ship List"** means a list of quantities of PM USA Products (by brand packing or promotional packing) to be shipped to designated retail Customers.

**"Returns"** means Tobacco Products returned to a Distributor by a Customer.

**"Saleable"** means Tobacco Products that are in a condition to be sold to Customers.

**"Site"** means a location from which Participant ships, or permits to be removed, Tobacco Products. Site does not include a location from which a Related Distributor ships Tobacco Products.

**"STARS"** means the MSA Store Tracking Analytical Reporting System.

**"STARS Calendar"** means the calendar in Exhibit A.

**"State"** means any of the United States of America or the District of Columbia.

**"Supplemental E-Ordering Process"** means the process pursuant to which a retail Customer authorizes AGDC to transmit, on such Customer's behalf, orders for PM USA Products. AGDC transmits such Supplemental Product Orders to Participant in an E-Order Ship List.

**"Supplemental Product Order"** means an order included in an E-Order Ship List that designates, by brand packing, a quantity of a PM USA Product to be shipped to a designated retail Customer.

**"Terms Measurement Period"** means the Quarter during which PM USA measures Participant's Program performance to determine the Terms Rate or Volume-Weighted Terms Rate that will apply two Quarters later.

**"Terms Rate"** means a percentage allowance to be deducted from the list price of PM USA Cigarettes in the amount set forth in Exhibit A.

**"Tobacco Product"** means any product subject to the reporting requirements set forth in the PM USA STARS Tobacco Products Reporting Package.

**"Top Ten PM USA Packings"** means the top ten packings of PM USA Cigarettes set forth in Exhibit A.

**"Transshipments"** means Outbound Shipments: (i) from one Direct-Buying Site to another; (ii) from one Site to a Direct-Buying Site that is not a Related Distributor; or (iii) from a Related NDD to a Direct-Buying Site that is not a Related Distributor.

**"UPC/SKU"** means the Universal Product Code and the Stock Keeping Unit.

**"Volume-Weighted Terms Rate"** means the effective Terms Rate for any Direct Distributor that ships PM USA Cigarettes into more than one State, calculated in accordance with Part X.A.5.

**"We Card"** means the program designed by We Card Program, Inc. to educate and assist retailers in verifying the age of individuals who seek to purchase Tobacco Products and informing such individuals that the retailer does not sell to anyone who is not old enough to purchase Tobacco Products legally where the retailer's store is located.

**"We Card Items"** means the We Card Minimum Age Calendar, the We Card Age of Purchase Stickers, the We Card Fake ID Tip Sheet, and additional items that may be produced by We Card Program, Inc. and designed to assist retailers with age verification.

**"We Card Signs"** means signs produced by We Card Program, Inc. that inform customers that the retailer verifies the age of individuals who seek to purchase Tobacco Products and that the retailer does not sell Tobacco Products to anyone who is not old enough to purchase Tobacco Products legally where the retailer's store is located.

## II. DATA REPORTING.

### A. Reporting Obligations.

**1. Weekly Reports.** Participant must submit complete and accurate Data to PM USA each Reporting Week for each Site and Related NDD.

**2. Data.** Participant must submit the following Data in a Data file formatted in accordance with the instructions provided in the PM USA STARS Tobacco Products Reporting Package:

**a.** All Outbound Shipments;

**b.** All Returns;

**c.** All Customers to which a Site or Related NDD makes Outbound Shipments or from which a Site or Related NDD accepts Returns;

**d.** Classification of each Customer as either: (i) MSA Retailer, (ii) MSA Distributor, or (iii) MSA Other. In the event of a disagreement as to the Classification of any Customer, PM USA's determination will be final; and

**e.** Inventory as of the close of business on the last day of each Reporting Week. For the last Reporting Week of each Quarter, such Inventory must be a Physical Inventory, and the Inventory records of each Site and Related NDD must reflect the results of the Physical Inventory prior to submission of the Data for such last Reporting Week.

**3. Means of Submission.** Participant must submit Data to MSA by one of the media types specified in the PM USA STARS Tobacco Products Reporting Package.

**4. Time of Submission.** Participant must submit Data for each Reporting Week to MSA no later than the Reporting Week Deadline.

**5. Reconciliation of Data.**

**a.** After each Reporting Week for which Data is submitted, Participant must reconcile such Data against its internal records, including records of Outbound Shipments, Returns, Customers,

and Inventory, of each Site and Related NDD.  Participant must take immediate action to correct any missing, inaccurate, late, incomplete, or duplicate Data.

        **b.**    Within 48 hours after Participant's receipt of the MSA Confirmation, Participant must report to its MSA Help Desk representative any discrepancy between the Control Totals on the MSA Confirmation and (i) the Data on which such Control Totals are based and (ii) the Site's or Related NDD's internal Outbound Shipment, Return, Customer, and Inventory records.

      **B.**    **14-Day Resubmission Deadline.**  Participant must correct any Data previously reported incorrectly for any Site or Related NDD, or submit complete and accurate Data for any Data not previously reported for any Site or Related NDD, no later than the 14-Day Resubmission Deadline for the Data.

      **C.**    **Quarterly Resubmission Deadline.**  Participant must submit Data to correct any Data that previously was reported incorrectly for any Site or Related NDD during a Quarter, or submit complete and accurate Data for any Data not previously reported for any Site or Related NDD during such Quarter, no later than the Quarterly Resubmission Deadline for such Quarter.

**III.**    **SUPPLEMENTAL E-ORDERING PROCESS OBLIGATIONS.**  Participant must meet all execution requirements prescribed by PM USA in connection with the Supplemental E-Ordering Process, including the following:

      **A.**    Participant must provide to PM USA and maintain at all times during the term of this Agreement, a valid e-mail address or fax number for receipt of E-Order Ship Lists, and immediately notify PM USA of any change in such e-mail address or fax number.

      **B.**    Participant must meet or exceed the 50% Supplemental E-Ordering Process execution percentage for each Site during each Quarter in accordance with the following calculation:

        **1.**    **Step One.**  Determine for the Quarter the total number of Supplemental Product Orders listed on all E-Order Ship Lists with respect to which the Site shipped no less than the designated quantity of PM USA Product to the designated retail Customer within two Reporting Weeks after the transmission of the relevant E-Order Ship List. Amounts shipped are based on Outbound Shipments, net of Returns.

        **2.**    **Step Two.**  Divide the result of **Step One** by the total number  of all Supplemental Product Orders listed on all E-Order Ship Lists transmitted to the Site during the applicable Quarter.

      **C.**    Upon receipt of an E-Order Ship List, Participant must inform its AGDC representative of any retail Customer included on such E-Order Ship List to which Participant does not currently supply PM USA Products.

**IV.**    **VALUE-ADDED SERVICES OBLIGATIONS.**  Participant will ensure that all of Participant's Sites and Related NDDs that sell PM USA Products provide the following value-added services:

      **A.**    With respect to a Promotion pursuant to which PM USA reduces the price at which it sells specified PM USA Products by a specified off-invoice allowance (or temporary reduction in price) or offers such product at a special reduced list price, Participant will cause each Site and Related NDD to reduce the price at which such Site or Related NDD sells such specified PM USA Products by no less than the amount of the off-invoice allowance (or temporary reduction in price or special reduced  list price) provided by PM USA on such PM USA Products.  Participant will also cause each Site and Related NDD to indicate its regular prices and all applicable off-invoice allowances (or temporary reductions in price or special reduced  list prices) on all invoices for such specified PM USA Products, except invoices for such PM USA Products delivered to Minnesota and wherever else not permitted by law.

      **B.**    Maintain distribution and inventory of PM USA Products, brands and packings in varieties and quantities appropriate to satisfy market demand.

      **C.**    Accept and distribute all New Offerings, Promotional Products, and seasonal offerings in accordance with terms and requirements communicated by PM USA.

**D.**     If a Site has any Promotional Products remaining after delivery or attempted delivery of such Promotional Product, Participant will contact PM USA for subsequent delivery instructions.  Participant must not deliver remaining Promotional Product to any Customer except as directed by PM USA.

**E.**     Maintain inventory in an amount designated by PM USA of each New Offering and seasonal offering offered by PM USA during the Introductory Period.

**F.**     Include in the Site's and Related NDD's retail order materials all PM USA Products, brands and packings carried in the Site's and Related NDD's respective inventories.

**G.**     Provide computer-generated invoices and receipts to all Customers for all Outbound Shipments shipped from the Site or Related NDD by UPC/SKU for Tobacco Products of all Manufacturers.

**H.**     Accept Returns of PM USA Products for delivery to PM USA when directed by PM USA in accordance with special returned goods initiatives or otherwise.

**I.**     **Underage Access Prevention Education Requirements.**

**1.**     Ensure that all employees who meet with Customers that sell Tobacco Products complete We Card training produced by We Card Program, Inc. and are trained on how to supply those Customers a We Card order form at least once annually.  Provide a certification that all such employees completed the training within the 12 months before the Effective Date of this Agreement.

**2.**     Ensure that all new employees who meet with Customers that sell Tobacco Products complete We Card training and are trained on how to supply Customers a We Card order form within 90 days after beginning employment.

**3.**     Make We Card Items and We Card Signs available at each Site and Related NDD.

**4.**     Print the We Card logo and instructions for obtaining information regarding the We Card Program on every invoice for the sale of Tobacco Products issued by a Site or Related NDD.

**5.**     Comply with other We Card and underage access prevention education requirements, as specified by PM USA.

**J.**     **Inventory Storage Requirements.**

**1.**     Store all PM USA Products available for sale (i) away from excessive heat and sunlight; (ii) away from excessive odors; (iii) above floor level; and (iv) in accordance with other detailed specifications that PM USA may provide from time to time.

**2.**     Ship all PM USA Products on a first-in-first-out basis unless directed otherwise by PM USA.

**3.**     Segregate from inventory available for sale all Non-Saleable PM USA Products.

**K.**     Limit the resale of PM USA Products in a PM USA-designated test market to the geographical areas specified by PM USA.

**V.     PROMOTION EXECUTION OBLIGATION, SPEED TO MARKET INCENTIVES AND DISTRIBUTION SERVICES.**

**A.     Promotion Execution Obligation.**  Participant will meet all execution requirements prescribed by PM USA for any PM USA Cigarette Product Related Initiative, including the following:

**1.**     Participant will meet or exceed the 50% Promotion execution obligation for each Site during each Quarter in accordance with the following calculation:

    **a.**  **Step One.**  Determine for the Quarter, the total number of entries listed on all Retail Ship Lists for all designated PM USA Cigarette Product Related Initiatives with respect to which the Site shipped no less than the designated quantity of PM USA Cigarettes to the designated retail Customer within the time period designated by PM USA.  In no event will any such time period be less than 13 days.  Quantities shipped are based on Outbound Shipments, net of Returns.

    **b.**  **Step Two.**  Divide the result of **Step One** by the total number of all entries listed on all Retail Ship Lists provided to the Site for all designated PM USA Cigarette Product Related Initiatives during the applicable Quarter.

    **2.**  If PM USA is late delivering the designated product, PM USA, in its sole discretion, may adjust designated time periods accordingly.

    **3.**  Participant will ship all Promotional Product, point of sale materials and any other materials as directed by PM USA.

  **B.**  **Speed to Market Incentives.**  Participant will earn the applicable Cents Per Cigarette Carton Rates for the PM USA Cigarette Speed to Market Incentives, as set forth in Exhibit A, for each Direct-Buying Site during each Quarter in which the Direct-Buying Site meets or exceeds the Speed to Market Incentive percentages of 80% or 90%, in accordance with the calculation set forth in Part V.A.1.

  **C.**  **Distribution Services Obligation.**  If eligible, Participant will earn the Distribution Services Cents Per Cigarette Carton Rate for Payment-Eligible Outbound Shipments of PM USA Cigarettes, as set forth in Exhibit A, during each Quarter in which the Direct-Buying Site provides Distribution Services to at least 50% of its Customers.

**VI.**  **GENERAL OBLIGATIONS OF PARTICIPANT UNDER THE PROGRAM.**

  **A.**  **Purchase or Shipment of Top Ten PM USA Packings.**  Participant will not purchase the Top Ten PM USA Packings from any source except PM USA or an Affiliated Direct Distributor, and Participant will not ship any such packings to any non-Affiliated Direct Distributor.  The Top Ten PM USA Packings are set forth in Exhibit A.  A list of Direct Distributors is available on www.altriasales.com.

  **B.**  **Returns of PM USA Packings for Resale.**  Participant will not accept Returns of PM USA Products for the purpose of resale if (1) the PM USA Products consist of any cigarette packings listed in Exhibit A, or (2) PM USA otherwise prohibits the acceptance of such Returns.

  **C.**  **Payment-Eligible Volume Obligation.**  Participant's Payment-Eligible Outbound Shipments of PM USA Cigarettes from each Direct-Buying Site must comprise no less than 85% of its Outbound Shipments of PM USA Cigarettes for that Direct-Buying Site in each Quarter.

  **D.**  **Disclosure Obligations.**

    **1.**  **Initial Disclosures.**  At the time of execution of this Agreement, Participant will disclose to PM USA the following information:

    **a.**  All Sites from which Participant makes Outbound Shipments and those that provide Distribution Services;

    **b.**  All Distributors or retailers that are Affiliates of Participant or with which Participant or Participant's principals have any other type of relationship, including a direct or indirect non-Controlling interest, and each location from which any such Distributor or retailer ships or permits to be removed Tobacco Products;

    **c.**  All Distributors with which Participant has an oral or written agreement directly or through an Affiliate regarding the tax stamping, ordering, purchasing, billing, delivering, warehousing, returns processing, promotion assembling or other handling of Tobacco Products;

    **d.**  Participant's owners, officers and directors, and Participant's senior managers principally responsible for Participant's performance under this Agreement;

     **e.**    All indictments and convictions of Participant, its officers, directors or owners with Control for any criminal offense related to the sale or distribution of Tobacco Products that occurred after January 1, 2011; and

     **f.**    Whether (i) Participant, (ii) any Affiliated Distributor or retailer, (iii) any Distributor disclosed in compliance with Part VI.D.1.c. above, or (iv) an officer, director, or owner of (i), (ii), or (iii) is engaged in the sale or distribution of PM USA Products over the Internet or by telephone or mail order.

     **2.**    **Obligation to Supplement Initial Disclosures.**  Participant will supplement the information disclosed pursuant to Part VI.D.1. by completing the relevant portions of Pages 1 and 2, no later than seven days prior to any change in the previously submitted information. Participant will supplement or correct in the same manner all information disclosed under Part VI.D.1. or this Part VI.D.2. if Participant becomes aware that any information disclosed is incomplete or incorrect. If disclosure no later than seven days in advance is prohibited by law or is impracticable, Participant must make the disclosure as soon as permissible or practicable.

     **3.**    **Disclosures Regarding Acquisitions, Sales and Changes in Control.**  Participant will notify PM USA using the relevant portions of Pages 1 and 2 (or such form as PM USA may designate), no later than seven days prior to the consummation of any (a) acquisition by Participant directly or indirectly of all or a substantial part of the business or assets of any Distributor or retailer of cigarettes, (b) sale by Participant of all or a substantial part of Participant's business or assets, or (c) Change in Control of Participant. If disclosure no later than seven days in advance is prohibited by law or is impracticable, Participant must make the disclosure as soon as permissible or practicable.

     **4.**    **Financial Records.**

     **a.**    **Annual Statements.**  Upon PM USA's request, Participant must submit annual financial statements (including balance sheets, income statements, cash flow statements, opinion letters, and the accompanying notes or supplementary schedules) that are either:

     **(i)**    audited or reviewed by an independent certified public accountant and prepared in accordance with Generally Accepted Accounting Principles; or

     **(ii)**    in a compiled format and certified by an officer of Participant that the statements are correct to the best of such officer's knowledge.

     **b.**    **Quarterly Statements.**  Upon PM USA's request, Participant must submit quarterly financial statements (including balance sheets, income statements, cash flow statements, opinion letters, and the accompanying notes or supplemental schedules) that have been prepared by a certified public accountant, in accordance with Generally Accepted Accounting Principles.

     **c.**    **Timing of Disclosure.**

     **(i)**    The records specified in Part VI.D.4.a. must be received by ALCS at the following email or fax number: financialstatements@altria.com or 919-884-3618 no later than 30 days from PM USA's request.

     **5.**    **Requests for Additional Disclosures.**  Participant will timely comply with any requests by PM USA for additional information or documents regarding Participant's disclosures made pursuant to this Part VI.D. or Participant's satisfaction of its obligations under this Agreement. Participant also will timely comply with any requests by PM USA for books, records or documentation required to be maintained by Participant under Part VI.F.

     **E.**    **Obligation Not to Engage in Prohibited Conduct.**  Participant will not, and will ensure that its Related NDDs do not, engage, directly or indirectly, in any of the following activities:

     **1.**    **Sales in Violation of the Law.**  The sale, use, or distribution of PM USA Products in a manner that violates federal, State, local, or other applicable laws, regulations, or ordinances;

**2.     Sales in Violation of PM USA Trade Policies.**  The sale, use, or distribution of PM USA Products in violation of PM USA Trade Policies;

**3.     Sales of Non-Saleable PM USA Products.**  The sale, use, or distribution of Non-Saleable PM USA Products;

**4.     Exports.**  The export of PM USA Products (or products manufactured by or for an Affiliate of PM USA) directly or indirectly to Persons located outside of the United States; and

**5.     Imports.**  The import of products manufactured by an entity other than PM USA bearing PM USA-owned or exclusively licensed trademarks.

**F.     Document Retention.**  Participant, its Sites and Related NDDs must maintain complete and accurate books and records and retain all documentation with respect to performance under this Agreement for a minimum of three calendar years or for such longer period as required by law.  Such documentation will include, Customer invoices; historical reports regarding Outbound Shipments, Returns, Customers, and Inventory; MSA Confirmations; documents evidencing Participant's reconciliation of Data in accordance with Part II.A.5.; shipping logs; bills of lading; cash receipts; accounts receivable records; State excise or use tax returns as filed in any State and all supporting schedules; documents sufficient to evidence the payment of all applicable State and local taxes (including the purchase of tax stamps) for all products; filed federal and State income tax returns; financial statements and all supporting financial records, books of account, reports and data; documents evidencing that Participant has all required licenses to operate as a seller of Tobacco Products in each State in which it distributes PM USA Products; distribution licenses, tax stamping licenses, and all other licenses and permits; and historical records of Physical Inventories with corresponding adjustments (by UPC/SKU) to inventory systems and reconciliation reports.

**G.     Audits and Inspections.**  Upon the request of PM USA or its designee, Participant will, and will cause each of its Sites and Related NDDs to, permit PM USA, or a PM USA designee, to audit, review, and inspect, with or without notice, its books, records, documentation (including all documents required to be retained under Part VI.F.), Tobacco Product inventory and premises and to interview its officers and employees as necessary, in PM USA's sole discretion, to evaluate Participant's satisfaction of its obligations under this Agreement or Participant's right to receive any benefits under this Agreement.  Upon PM USA's request, Participant will submit full and complete copies of documentation to PM USA or the PM USA designee in lieu of, or in addition to, PM USA or the PM USA designee conducting an on-site audit, review, or inspection.  Audits, reviews, and inspections may include, or consist only of, physical inventories or physical inspections conducted by or on behalf of PM USA of all Tobacco Products in Participant's possession or under its control.

**H.     Compliance with Laws.**  Participant will comply with all applicable laws, regulations, consent agreements and ordinances relating to this Agreement, Participant's performance of this Agreement, and the sale, use, or distribution of PM USA Products.  Participant represents and warrants that it has obtained all licenses, permits, consents, and other authorizations necessary for the conduct of its business and that it will maintain all such licenses, permits, consents, and other authorizations in full force and effect throughout the term of this Agreement.  Participant will comply with all federal, State, local, or other laws, regulations and ordinances applicable to the sale of Tobacco Products, including the Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1331 et seq.), the Family Smoking Prevention and Tobacco Control Act (21 U.S.C. § 301 et seq.), and State laws, including those promulgated in connection with the Master Settlement Agreement.

**I.     Licenses and Resale Certificates.**  Participant represents and warrants that (i) for each State and municipality in which Participant engages in the distribution of PM USA Products, or into which Participant ships (or causes to be shipped) PM USA Products, Participant has all licenses or permits required by law or regulation to engage in such activities, (ii) for each State and municipality in which a Direct-Buying Site is located, Participant has provided to ALCS a copy of any required license or permit to engage in the distribution of PM USA Products with respect to such Direct-Buying Site, and (iii) for each State or municipality in which a Direct-Buying Site is located and for which Participant claims an exemption from State or municipal sales tax for Tobacco Products purchased from PM USA for resale, Participant has provided to ALCS a copy of a properly executed exemption/resale certificate.  If Participant does not have the required license, permit, or certificate specified above in subsections (i) through (iii) for any applicable State or municipality, Participant represents and warrants that it has documentation from such State or municipality confirming that Participant is exempt from the licensing, permitting or sales tax requirements.  Upon PM USA's request for any license, permit, certificate, or other documentation referenced in this Part VI.I., Participant will promptly provide to ALCS any such documents, and

upon renewal of any license, permit, certificate, or other documentation referenced in this Part VI.I.(ii) or (iii), Participant will promptly provide to ALCS any documents evidencing such renewal.

**J.      State and Local Excise Taxes on PM USA Products.**  Participant will pay or will cause to be paid any applicable State or local excise taxes due on all PM USA Products purchased or sold by Participant.

**K.      Compliance with PM USA Trade Policies.**  Participant will comply, and will cause its Related NDDs to comply, with all applicable PM USA Trade Policies.

**L.      Compliance with PM USA Terms and Conditions of Sale**.  Participant will comply with the PM USA Terms and Conditions of Sale.

**M.      No Financial Harm to PM USA.**  Participant will not be a party to, or otherwise participate in a commercial transaction that may result, directly or indirectly, in a financial loss to PM USA.

**N.      Non-Disparagement.**  Participant will not disparage PM USA or its products or brands.

**O.      Retail Leaders Participation.**  Each Affiliate of Participant that is a retailer of cigarettes will participate in and comply with the PM USA Retail Leaders Program.  Each Affiliate of Participant that meets the eligibility requirements for the PM USA Wholesale Club Program will participate in and comply with such program.

**VII.      PM USA SHARE AND SHARE TARGETS FOR PM USA CIGARETTES.**

**A.      PM USA Share.**  PM USA will determine Participant's PM USA Share for each State, on a Quarterly basis, by dividing the total of Participant's PM USA Qualified Shipments into such State by Participant's Industry Qualified Shipments into such State, during the Quarter.  If more than one of Participant's Sites or Related Distributors ships into a State the calculation will be based upon the aggregate of their shipments into the State, resulting in all of Participant's Direct-Buying Sites having the same PM USA Share for a single State.

     **1.      Participant's PM USA Qualified Shipments.**  PM USA Qualified Shipments means the result of the following calculation:

          **a.      Step One.**  Determine total Outbound Shipments of PM USA Cigarettes by Participant's Sites and Related Distributors into the State during the Quarter.  Only those locations and Persons identified as a "Site" or "Related Distributor" as of the Affiliation/Site Determination Date for such time period will be considered Sites or Related Distributors for purposes of this Part VII.A.1.

          **b.      Step Two.**  Subtract from the result of **Step One** (i) Returns of PM USA Cigarettes from Customers in the State during the Quarter; and (ii) Outbound Shipments of PM USA Cigarettes into the State during the Quarter that are:

              (A)      Transshipments;

              (B)      shipped in violation of PM USA Trade Policies;

              (C)      shipped to any Customer engaged in the sale of PM USA Cigarettes in violation of the PM USA Remote Cigarette Sales Trade Policy, or to an NDD that ships PM USA Cigarettes to any such Customer;

              (D)      shipped to any Customer that has been classified as MSA Other or to an NDD that ships PM USA Cigarettes to any such Customer;

              (E)      shipped to a Related NDD;

              (F)      shipped to a Non-Reporting NDD or to an NDD that ships PM USA Cigarettes to any such Customer;

              (G)      shipped to a Customer if (a) shipments of PM USA Cigarettes represent 80% or more of all cigarettes shipped to such Customer by Participant and (b) such Customer receives shipments of 10,400 or more cartons of PM USA Cigarettes per Quarter;

(H)      shipped to a non-Related NDD if shipments of PM USA Cigarettes to such NDD represent 80% or more of all cigarettes shipped to such NDD by Participant; or

(I)      shipped to a Non-Eligible Customer or to an NDD that ships PM USA Cigarettes to any such Customer.

**2. Participant's Industry Qualified Shipments.**  Industry Qualified Shipments means the result of the following calculation:

**a. Step One.**  Determine the total Outbound Shipments of all Manufacturers' cigarettes by Participant's Sites and Related Distributors into the State during the Quarter. Only those locations and Persons identified as a "Site" or "Related Distributor" as of the Affiliation/Site Determination Date for such time period will be considered Sites or Related Distributors for purposes of this Part VII.A.2.

**b. Step Two.** Subtract from the result of **Step One** (i) Returns of all Manufacturers' cigarettes from Customers in the State during the Quarter; and (ii) Outbound Shipments of cigarettes into the State during the Quarter that are:

(A)      Transshipments;

(B)      shipped to a Related NDD;

(C)      PM USA Cigarettes shipped to a Customer if (a) shipments of PM USA Cigarettes represent 80% or more of all cigarettes shipped to such Customer by Participant and (b) such Customer receives shipments of 10,400 more cartons of PM USA Cigarettes per Quarter; or

(D)      PM USA Cigarettes shipped to a non-Related NDD if shipments of PM USA Cigarettes to such NDD represent 80% or more of all cigarettes shipped to such NDD by Participant.

**B. PM USA Share Targets.**  The PM USA Share Targets are set forth in Exhibit A.

**VIII.    PM USA Share Change and PM USA Share Maintenance Incentive.**

**A.    PM USA Share Change**

**1.**      PM USA will calculate Participant's PM USA Share Change for each State into which Participant's Sites and Related Distributors ship Outbound Shipments of PM USA Cigarettes during the Quarter as follows.

**a. Step One.**  Calculate Participant's PM USA Share for each State into which Participant ships Outbound Shipments of PM USA Cigarettes during the Quarter as outlined in Part VII.A.

**b. Step Two.**  Subtract from the result of **Step One** Participant's PM USA Share for the applicable State during the same Quarter in the prior year to determine the PM USA Share Change. All of Participant's Sites will have the same PM USA Share Change for a single State.

**B.    PM USA Share Maintenance Incentive.**

**1.**      Participant will earn the applicable PM USA Share Maintenance Incentive Cents Per Cigarette Carton Rate set forth in Exhibit A for each Quarter and each State in which (i) Participant's PM USA Share Change is equal to or greater than negative 0.5%; or (ii) Participant's PM USA Share is greater than or equal to 65%.

**IX.    PM USA PAYMENTS.**  PM USA will make Payments earned by Participant following the close of each Quarter based on the performance of Participant's Direct-Buying Sites during such Quarter. Only those locations identified as "Direct-Buying Sites" as of the Affiliation/Site Determination Date for the Quarter will be considered Direct-Buying Sites for purposes of this Part IX. Following each Quarter, PM USA will determine the amount of such Payment for each Direct-Buying Site, as provided in this Part IX.

**A.      Determination of PM USA Share.**  PM USA will calculate Participant's PM USA Share in each State into which any of Participant's Sites or Related Distributors shipped Outbound Shipments of PM USA Cigarettes during the Quarter pursuant to Part VII.A.  Participant will have one PM USA Share for a single State.

**B.      Determination of Performance Level.**  Using Participant's PM USA Share and the PM USA Share Targets in Exhibit A, PM USA will determine the Performance Level for which Participant qualifies in each State into which any of Participant's Sites or Related Distributors shipped Outbound Shipments of PM USA Cigarettes during the Quarter.

**C.      Determination of Base Cents Per Cigarette Carton Rates.**  PM USA will use Participant's Performance Level for each State to determine the Base Cents Per Cigarette Carton Rate for all of Participant's Direct-Buying Sites that shipped Outbound Shipments of PM USA Cigarettes into the State during the Quarter. All of Participant's Direct-Buying Sites that ship into a single State will earn the same Base Cents Per Cigarette Carton Rate.

**D.      Distribution Services Cents Per Cigarette Carton Rate.**  PM USA will use Participant's Performance Level for each State to determine if Participant's Direct-Buying Sites that provided Distribution Services and shipped Outbound Shipments of PM USA Cigarettes into the State during the Quarter are eligible to earn the Distribution Services Cents Per Cigarette Carton Rate in Exhibit A.

**E.      Determination of Share Maintenance Incentive Cents Per Cigarette Carton Rates.**  For each Direct-Buying Site that earns the Share Maintenance Incentive, PM USA will use Participant's Performance Level for each State to determine the Share Maintenance Incentive Cents Per Cigarette Carton Rate for all of Participant's Direct-Buying Sites that shipped Outbound Shipments of PM USA Cigarettes into the State during the Quarter.  All of Participant's Direct-Buying Sites that ship into a single State will earn the same Share Maintenance Incentive Cents Per Cigarette Carton Rate.

**F.      Calculation for PM USA Cigarettes.**  PM USA will determine the Payment for PM USA Cigarettes attributable to each Direct-Buying Site for the Quarter by performing the following set of calculations separately for each State:

**1.      Step One.**  Determine the Direct-Buying Site's Payment-Eligible Outbound Shipments of PM USA Cigarettes into the State during the Quarter as follows:

**a.**      Subtract from the Direct-Buying Site's total Outbound Shipments of PM USA Cigarettes into the State during the Quarter the following:  (i) Returns of PM USA Cigarettes from Customers in the State to the Direct-Buying Site during the Quarter; and (ii) Outbound Shipments of PM USA Cigarettes into the State by the Direct-Buying Site during the Quarter that were:

(A)      Transshipments;

(B)      shipped in violation of PM USA Trade Policies;

(C)      shipped to any Customer engaged in the sale of PM USA Products in violation of the PM USA Remote Cigarette Sales Trade Policy, or to an NDD that ships PM USA Cigarettes to any such Customer;

(D)      shipped to any Customer that has been classified as MSA Other, or to an NDD that ships PM USA Cigarettes to any such Customer;

(E)      shipped to a Non-Reporting NDD or to an NDD that ships PM USA Cigarettes to any such Customer;

(F)      shipped to a single MSA Retailer in excess of 10,400 cartons of PM USA Cigarettes; or shipped to a single MSA Retailer and when combined with Outbound Shipments of PM USA Cigarettes from all Distributors to the MSA Retailer, in excess of 10,400 cartons.  A Direct-Buying Site's Outbound Shipments will be reduced by its pro rata share of all Distributors' shipments of PM USA Cigarettes to the MSA Retailer multiplied by the number of Cartons over 10,400 cartons shipped to the MSA Retailer.  No reduction will be taken if the MSA Retailer is an "Uncapped Store", as defined in the PM USA Retail Leaders Program Agreement and determined by PM USA in its sole discretion; or

(G)        shipped to a Non-Eligible Customer or to an NDD that ships PM USA Cigarettes to any such Customer.

**2.        Step Two.**  Multiply the number of cartons of Payment-Eligible Outbound Shipments of PM USA Cigarettes shipped by the Direct-Buying Site into each State by the Base Cents Per Cigarette Carton Rate applicable to the Direct-Buying Site in each State.

**3.        Step Three.**  If the Direct-Buying Site provides Distribution Services, multiply the incremental Distribution Services Cents Per Cigarette Carton Rate associated with the Direct-Buying Site's Performance Level (listed in Exhibit A) by the number of cartons of Payment-Eligible Outbound Shipments of PM USA Cigarettes shipped by the Direct-Buying Site into each State.

**4.        Step Four.**  If the Direct-Buying Site meets a Speed to Market Incentive Percentage greater than or equal to 80% but less than 90%, multiply the applicable Cents Per Cigarette Carton Rate associated with the Direct-Buying Site's Performance Level (listed in Exhibit A) by the number of cartons of Payment-Eligible Outbound Shipments of PM USA Cigarettes shipped by the Direct-Buying Site into each State.

**5.        Step Five.**  If the Direct-Buying Site meets a Speed to Market Incentive Percentage of 90% or more, multiply the applicable Cents Per Cigarette Carton Rate associated with the Direct-Buying Site's Performance Level (listed in Exhibit A) by the number of cartons of Payment-Eligible Outbound Shipments of PM USA Cigarettes shipped by the Direct-Buying Site into each State.

**6.        Step Six.**  If the Direct-Buying Site earns PM USA Share Maintenance Incentive in a State as set forth in Part VIII.B, multiply the applicable Share Maintenance Incentive Cents Per Cigarette Carton Rate associated with the Direct-Buying Site's Performance Level (listed in Exhibit A) by the number of cartons of Payment-Eligible Outbound Shipments of PM USA Cigarettes shipped into such State by the Direct-Buying Site.

**7.        Step Seven.**  Aggregate the results of **Steps Two, Three, Four, Five, and Six** for all States to which the Direct-Buying Site has Payment-Eligible Outbound Shipments of PM USA Cigarettes.

**8.        Step Eight.**  Subtract from the result of **Step Seven**, the Payment reductions calculated in accordance with Part XII. PM USA will calculate the result of **Steps One** through **Eight** for each Direct-Buying Site to determine the total Payment due to Participant for PM USA Cigarettes with respect to all Direct-Buying Sites.

**G.        Calculation for PM USA Non-Cigarette Products.**  PM USA will determine the Payment for PM USA Non-Cigarette Products attributable to each Direct-Buying Site for the Quarter by performing the following set of calculations separately for each State:

**1.        Step One.**  Determine the Direct-Buying Site's Payment-Eligible Outbound Shipments of PM USA Non-Cigarette Products during the Quarter as follows:

**a.**        Subtract from the total Outbound Shipments of PM USA Non-Cigarette Products by the Direct-Buying Site during the Quarter:  (i) Returns of PM USA Non-Cigarette Products from Customers in the State to the Direct-Buying Site during the Quarter; and (ii) Outbound Shipments of PM USA Non-Cigarette Products by the Direct-Buying Site during the Quarter that were:

(A)        Transshipments;

(B)        shipped in violation of PM USA Trade Policies;

(C)        shipped to any Customer engaged in the sale of PM USA Products in violation of the PM USA Remote Cigarette Sales Trade Policy, or to an NDD that ships PM USA Non-Cigarette Products to any such Customer;

(D)        shipped to any Customer that has been classified as MSA Other or to an NDD that ships PM USA Non-Cigarette Products to any such Customer;

(E)     shipped to a Non-Reporting NDD or to an NDD that ships PM USA Non-Cigarette Products to any such Customer; or

(F)     shipped to a Non-Eligible Customer or to an NDD that ships PM USA Non-Cigarette Products to any such Customer.

**2.     Step Two.**  Multiply the number of units of Payment-Eligible Outbound Shipments of PM USA Non-Cigarette Products shipped by the Direct-Buying Site by the Cents Per Non-Cigarette Product Unit Rate in Exhibit A.

**3.     Step Three.**  Total the results of **Step Two** for each PM USA Non-Cigarette Product.

**4.     Step Four.**  Subtract from the result of **Step Three**, the Payment reductions calculated in accordance with Part XII. PM USA will calculate the result of **Steps One** through **Four** for each Direct-Buying Site to determine the total amount of the Payment for all PM USA Non-Cigarette Products due to Participant with respect to all Direct-Buying Sites.

**H.     Disbursement of Payments.**  PM USA will disburse Payments earned in a Quarter as soon as practicable after the close of the Quarter.

**I.     Delivery of Payments.**  Participant may elect whether Payments earned and payable, will be (i) delivered by electronic funds transfer or check and (ii) on a Direct-Buying Site-by-Site basis to each Direct-Buying Site's Payment Address listed on Page 1, or to Participant with respect to some or all Direct-Buying Sites.

## X.     PM USA INVOICE TERMS.

**A.     PM USA Cigarettes.**  PM USA will determine the Terms Rate applicable to purchases of PM USA Cigarettes by Participant at each Direct-Buying Site eligible to purchase from PM USA.  The Terms Rate will be determined pursuant to this Part X and will not be applicable to purchases of PM USA Cigarettes that are subsequently Outbound Shipments shipped to (1) a Customer engaged in the sale of PM USA Products in violation of the PM USA Remote Cigarette Sales Trade Policy or to an NDD that ships PM USA Cigarettes to any such Customer, (2) a Non-Reporting NDD or to an NDD that ships PM USA Cigarettes to any such Customer, or (3) a Non-Eligible Customer or to an NDD that ships PM USA Cigarettes to any such Customer.

**1.     Determination of PM USA Share.**  PM USA will calculate Participant's PM USA Share in each State into which any of Participant's Sites shipped Outbound Shipments of PM USA Cigarettes during the Terms Measurement Period pursuant to Part VII.A.  All of Participant's Sites that ship into a single state will have the same PM USA Share for that State.

**2.     Determination of Performance Level.**  Using Participant's PM USA Share in each State, PM USA will determine the Performance Level for which Participant qualifies in each State into which any of Participant's Sites shipped Outbound Shipments of PM USA Cigarettes during the Terms Measurement Period.  All of Participant's Direct-Buying Sites will have the same Performance Level for a single State.

**3.     Terms Measurement Period.**  The Terms Measurement Period is the Quarter during which PM USA measures Participant's Program performance to determine the Terms Rate or Volume-Weighted Terms Rate that will apply two Quarters later.  For example, for the third Quarter of 2016, the Terms Measurement Period will be the first Quarter of 2016.

**4.     Determination of Terms Rate.**

**a.**     Using Participant's Performance Level in each State and the Payment Grid in Exhibit A, PM USA will determine the Terms Rate for which Participant qualifies during each Quarter for each State into which Participant ships Outbound Shipments of PM USA Cigarettes.

**b.**     Each time Participant fails to meet a quarterly Data resubmission obligation in Part II.C. during a Terms Measurement Period, Participant will default to the Performance Level 1 Terms Rate in every State into which Participant shipped Outbound Shipments of PM USA Cigarettes.

**5.     Determination of Volume-Weighted Terms Rate.**  If Participant shipped Outbound Shipments of PM USA Cigarettes into more than one State during the Terms Measurement Period, PM USA will calculate a single Volume-Weighted Terms Rate for all of Participant's Direct-Buying Sites for the applicable Quarter as follows:

**a.     Step One (each State).**  Divide the PM USA Qualified Shipments from all of Participant's Sites and Related Distributors into the State during the Terms Measurement Period by the PM USA Qualified Shipments from all of Participant's Sites and Related Distributors to all States during such time period.

**b.     Step Two (each State).**  Multiply the result of Step One above by the Terms Rate for PM USA Cigarettes applicable to the State.

**c.     Step Three (all States).**  Total the results of Step Two above for all States into which any of Participant's Sites or Related Distributors shipped Outbound Shipments of PM USA Cigarettes during the Terms Measurement Period.  The total is equal to the Volume-Weighted Terms Rate applicable to all of Participant's Direct-Buying Sites for the applicable Quarter.

**6.     New Participant.**  A New Participant that is not Affiliated with a Direct Distributor will initially be assigned the Terms Rate for PM USA Cigarettes that corresponds to Performance Level 3.  A New Participant that is Affiliated with a Direct Distributor will initially be assigned the same Terms Rate as its Affiliated Direct Distributor.  Once a New Participant reports data for at least seven weeks of a Terms Measurement Period, the New Participant's Terms Rate for PM USA Cigarettes will be determined by the data reported during that Terms Measurement Period.

**7.     Terms Effective Period.**  Participant's Terms Rate or Volume-Weighted Terms Rate for a Quarter will apply to orders for PM USA Cigarettes delivered during that Quarter.

**8.     PM USA Recoupment of Non-Payable Terms.**  If, in any Quarter, Participant received the Terms Rate on Outbound Shipments that PM USA does not consider to be eligible for a Terms Rate, then PM USA will recoup such Non-Payable Terms.  The amount to be recouped will be calculated as follows:

**a.     Calculation of Non-Payable Terms.**

**(i)     Step One.**  Multiply the lowest Marlboro list price offered during the Quarter by the volume of Outbound Shipments of PM USA Premium Brands shipped in that Quarter to (i) a Customer engaged in the sale of PM USA Products in violation of the PM USA Remote Cigarette Sales Trade Policy or to an NDD that ships PM USA Cigarettes to any such Customer, (ii) to a Non-Reporting NDD or to an NDD that ships PM USA Cigarettes to any such Customer, or (iii) to a Non-Eligible Customer or to an NDD that ships PM USA Cigarettes to any such Customer.

**(ii)     Step Two.**  Multiply the lowest PM USA Cigarette list price offered during the Quarter by the volume of Outbound Shipments of PM USA Discount Brands shipped in that Quarter to (i) a Customer engaged in the sale of PM USA Products in violation of the PM USA Remote Cigarette Sales Trade Policy or to an NDD that ships PM USA Products to any such Customer, (ii) a Non-Reporting NDD or to an NDD that ships PM USA Products to any such Customer, or (iii) to a Non-Eligible Customer or to an NDD that ships PM USA Cigarettes to any such Customer.

**(iii)     Step Three.**  Total the results of Step One and Step Two.

**(iv)     Step Four.**  Multiply the result of Step Three by Participant's applicable Terms Rate or Volume-Weighted Terms Rate for the Quarter.

**b.     PM USA Recoupment of Non-Payable Terms.**  PM USA will recoup Non-Payable Terms through PM USA's issuance of a debit memo to Participant in the subsequent Quarter.

**B.     PM USA Non-Cigarette Products.**  Each Direct-Buying Site that is eligible to purchase PM USA Non-Cigarette Products from PM USA may be eligible to do so pursuant to the Purchase Allowance(s) set forth on the Payment Grid in Exhibit A.

**C.     Payment Terms.**  Standard Payment Terms for PM USA Products are -2 Day. PM USA reserves the right to place Participant on -3 Day, -4 Day or -5 Day advance Payment Terms, or on wire-in-advance Payment Terms in its sole discretion based on its assessment of Participant's creditworthiness.

**D.     Accelerated Payment Option.**  If Participant elects Payment Terms of -3 Day, Participant will earn an incremental terms rate allowance on PM USA Products equal to the Accelerated Payment Option percentage ("APO Percentage") set forth in Exhibit A.  The APO Percentage will be added to Participant's Terms Rate or Volume-Weighted Terms Rate, for the period during which Participant participates in the Accelerated Payment Option, as set forth below.

**1.     Participation.**  Participant will earn the APO Percentage if Participant has completed and delivered to ALCS an Accelerated Payment Option Election Form, by the dates set forth in the ALCS Accelerated Payment Option Election Form, to the following email or fax number: financialstatements@altria.com; 919-884-3618.  Participation will be effective as soon as practicable following the submission of the Accelerated Payment Option Election Form.

**2.     Terms and Conditions of Accelerated Payment Option.**  If Participant has standard Payment Terms and participates in the Accelerated Payment Option, Participant authorizes ALCS to initiate debit entries by electronic funds transfer from Participant's designated bank account three business days prior to the scheduled day of delivery of PM USA Cigarettes ordered by Participant or any of Participant's Direct-Buying Sites. Exhibit A sets forth the Payment Terms, APO Percentage and the required order lead time.  If PM USA has placed Participant on -3 Day, -4 Day or -5 Day advance Payment Terms based on its assessment of Participant's creditworthiness pursuant to Part X.C. and Participant participates in the Accelerated Payment Option, Participant will remain on such Payment Terms unless otherwise determined by PM USA.

**3.     Termination.**  Participant may terminate its participation in the Accelerated Payment Option by giving written notice to ALCS at the following email or fax number: financialstatements@altria.com; 919-884-3618.  The termination will become effective as soon as practicable following the date on which such written notice is received by ALCS.

**XI.     NEW BUSINESS RULE.**  If Participant (i) begins supplying New Customer(s) that represent at least 5% of Participant's Industry Qualified Shipments of all Manufacturers' cigarettes; and (ii) experiences a reduction in PM USA Share that either (a) causes a reduction in Participant's Performance Level or (b) causes Participant to not earn the PM USA Share Maintenance Incentive, then Participant may be entitled to a Grace Period.   To receive a Grace Period, Participant must meet the applicable requirements below.  PM USA will grant Grace Periods on a State-by-State basis.

**A.     New Customers in a State Currently Supplied.**  In order for Participant to be eligible for a Grace Period with respect to New Customer(s) in a State that it currently supplies, Participant must satisfy the requirements set forth below:

**1.**     Participant must begin supplying New Customer(s) that represent at least 5% of Participant's Industry Qualified Shipments of all Manufacturer's cigarettes into a State either during (i) the Quarter in which the Participant began supplying the New Customer(s) or (ii) the subsequent Quarter;

**2.**     As a result of supplying the New Customer(s), either:

**a.**     Participant's Performance Level for that State must decline between (i) the Quarter immediately prior to the Quarter in which Participant began supplying the New Customer(s) and (ii) either the Quarter during which Participant began supplying the New Customer(s) or the subsequent Quarter; or

**b.**     Participant's PM USA Share Change for that State is less than negative 0.5% in either the Quarter during which Participant began supplying of the New Customer(s) or the subsequent Quarter;

**3.**     Participant must request a Grace Period in writing to the AGDC Section Sales Director for the State where Participant's headquarters is located and provide documentation supporting such request to the satisfaction of PM USA;

    **4.**    The request for a Grace Period must be made before the end of the Quarter following the Quarter in which either (i) the Performance Level reduction occurs or (ii) Participant does not earn the PM USA Share Maintenance Incentive;

    **5.**    Participant must be in compliance with the terms and conditions of this Agreement, as determined by PM USA; and

    **6.**    Participant must have participated in the Program for at least one full Quarter prior to requesting a Grace Period.

    **B.**    **New Customers in a State Not Previously Supplied.**  In order for Participant to be eligible for a Grace Period with respect to New Customer(s) in a State that Participant has not previously supplied, Participant must satisfy the requirements set forth below.

    **1.**    Participant must begin supplying New Customer(s) in a State into which Participant has not shipped PM USA Cigarettes for at least the past two Quarters, and such New Customer(s) represent at least 5% of Participant's <u>total</u> Industry Qualified Shipments of all Manufacturers' cigarettes in (i) the Quarter in which the Participant began supplying the New Customer(s) or (ii) the subsequent Quarter;

    **2.**    Participant must qualify for Performance Level 1 or 2 in that State for (i) the Quarter during which Participant began supplying the New Customer(s) or (ii) the subsequent Quarter;

    **3.**    Participant must request a Grace Period in a writing delivered to the AGDC Section Sales Director for the State where Participant's headquarters is located and provide documentation supporting such request to the satisfaction of PM USA;

    **4.**    The request for a Grace Period must be made before the end of the Quarter following the Quarter in which Participant began supplying the New Customer(s) in that State;

    **5.**    Participant must be in compliance with the terms and conditions of this Agreement, as determined by PM USA; and

    **6.**    Participant must have participated in the Program for at least one full Quarter prior to requesting a Grace Period.

    **C.**    **Grace Period with Respect to a Reduction in Performance Level.**  PM USA may grant, in its sole discretion, a four-Quarter Grace Period with respect to a reduction in Performance Level to Participant if requested in accordance with the requirements above.  PM USA will not grant subsequent Grace Periods with respect to a reduction in Performance Level for any acquisitions, affiliations or changes in business that occur during a Grace Period.  If PM USA grants Participant a Grace Period with respect to a reduction in Performance Level, then the following terms and conditions will apply:

    **1.**    During the Grace Period, Participant must either (i) restore its previous Performance Level or (ii) achieve a Performance Level in a State that Participant had not supplied prior to the acquisition of the New Business that is higher than the Participant's Performance Level in that State during the Quarter in which Participant began supplying the New Customer(s);

    **2.**    The Grace Period will start on the first day of the Quarter immediately following the Quarter in which Participant began supplying the New Customer(s);

    **3.**    During the Grace Period, Participant's PM USA Share as actually achieved will be used to calculate Participant's Performance Level for the applicable State for each Quarter;

    **4.**    If, in any Quarter of the Grace Period, Participant either (i) restores its previous Performance Level or (ii) achieves a Performance Level in the State that is higher than the Participant's Performance Level in the Quarter in which Participant began supplying the New Customer(s) in a State which it had not previously supplied, then

    **a.**    PM USA will issue a retroactive Payment to Participant reflecting the difference between (i) an amount equal to the Payment Participant would have earned based off of the Cents per Cigarette

Carton Rates for Base, Distribution Services, Speed to Market Incentive, and PM USA Share Maintenance Incentive corresponding to the higher Performance Level for all Quarters during the Grace Period and the Quarter in which Participant began supplying the New Customer(s), and (ii) the Payment amount Participant has already received for performance under the Program during the applicable time period, subject to all Payment reductions pursuant to Part XII. or Part XIII.A;

    **b.** PM USA will issue a retroactive Payment to Participant for the additional amount that would have been deducted from the list price of all PM USA Cigarettes purchased by Participant for any Quarter during the Grace Period and up to two Quarters following the end of the Grace Period in which a lower Volume-Weighted Terms Rate was applied;

   **5.** If Participant achieves Performance Level 3 in the applicable State during any Quarter of the Grace Period, the Grace Period will terminate and PM USA will issue retroactive Payments as set forth above.

  **D.** **Grace Period with Respect to Not Earning the PM USA Share Maintenance Incentive.**  PM USA may grant, in its sole discretion, a four-Quarter Grace Period with respect to not earning the PM USA Share Maintenance Incentive to Participant if requested in accordance with the requirements above.  PM USA will not grant subsequent Grace Periods with respect to not earning the PM USA Share Maintenance Incentive for any acquisitions, affiliations or changes in business that occur during a Grace Period.  If PM USA grants Participant a Grace Period with respect to not earning the PM USA Share Maintenance Incentive, then the following terms and conditions will apply:

   **1.** The Grace Period will start on the first day of the Quarter immediately following the Quarter in which Participant began supplying the New Customer(s);

   **2.** If, in any Quarter of the Grace Period, Participant's PM USA Share Change for the applicable State is greater than negative 0.5%, then

    **a.** PM USA will issue a retroactive Payment to Participant reflecting an amount equal to the sum of the Quarterly PM USA Share Maintenance Incentive Payments it would have earned under its Performance Level for each Quarter during the Grace Period and the Quarter in which Participant began supplying the New Customer(s), subject to all Payment reductions pursuant to Part XII. or Part XIII.A.

   **3.** If Participant earns the PM USA Share Maintenance Incentive in the applicable State during any Quarter of the Grace Period, the Grace Period will terminate and PM USA will issue a retroactive Payments as set forth above.

**XII.** **PAYMENT REDUCTIONS.**  If Participant fails to meet the obligations referenced below in this Part XII PM USA will reduce Participant's Payments that have been earned but not yet delivered for the Quarter in which the failure occurs.  Payment reductions will be capped at 100% of the Payments for the Quarter.  If the reduction amount exceeds the amount of any Payments not yet delivered, Participant will promptly repay PM USA the excess amount.  If a Direct-Buying Site fails to meet select obligations under the Agreement, PM USA will reduce the Payment due to Participant with respect to such Direct-Buying Site.  If a non-Direct-Buying Site fails to meet select obligations under this Agreement, PM USA will reduce the Payment due to Participant with respect to the Direct-Buying Site(s) that supplied such non-Direct-Buying Site during such Quarter.  The Payment reductions set forth in Parts XII.A., B., D. and E. below will only apply to (i) Payments for PM USA Cigarettes if the failure of the obligation occurred with respect to cigarettes and (ii) Payments for PM USA Non-Cigarette Tobacco Products if the failure occurred with respect to non-cigarette Tobacco Products.

  **A.** **Errors or Omissions in Weekly Data Submissions.**  If a Direct-Buying Site fails to meet any of its obligations under Part II.A. four or more times during a Quarter, Participant's Payment for that Direct-Buying Site will be reduced by 5% for such Quarter.

  **B.** **Failure to Submit Complete and Accurate Data by 14-Day Resubmission Deadline.**  If a Direct-Buying Site fails to meet any of its obligations under Part II.B. during a Quarter, Participant's Payment for that Direct-Buying Site will be reduced by 5% for such Quarter.  Participant will incur an additional 5% reduction for each subsequent failure of the Direct-Buying Site to meet any of its obligations under Part II.B. during such Quarter, resulting in a maximum Payment reduction of 65% (or 70% in a Quarter with 14 weeks) per Direct-Buying Site per Quarter.

**C.**     **New Participant.**  A New Participant will not be subject to the Payment reductions under Parts XII.A or B. for the first Quarter in which the New Participant participates in the Program, or for the first full Quarter thereafter, if the New Participant submits the required Data for each Reporting Week in each such Quarter by the applicable Quarterly Resubmission Deadline for such Quarter.

**D.**     **Failure to Submit Complete and Accurate Data by Quarterly Resubmission Deadline.**  If a Direct-Buying Site fails to meet any of its obligations under Part II.C. during a Quarter, Participant's Payment for that Direct-Buying Site will be reduced by 100% for such Quarter.

**E.**     **Failure to Meet Value-Added Services Obligations.**  If a Direct-Buying Site fails to meet any of its obligations under Part IV. during a Quarter, after having received two prior written warnings from PM USA in the same Quarter for the same failure, Participant's Payment for that Direct-Buying Site will be reduced by 100% for such Quarter.

**F.**     **Failure to Meet Supplemental E-Ordering Process Obligations.**  If a Direct-Buying Site fails to meet any of its obligations under Part III. during a Quarter, Participant's Payment for that Direct-Buying Site will be reduced by 5% for such Quarter.

**G.**     **Failure to Meet Promotion Execution Obligation.**  If a Direct-Buying Site fails to meet any of its obligations under Part V.A. during a Quarter, Participant's Payment for that Direct-Buying Site will be reduced by 10% for such Quarter.

**H.**     **Failure to Purchase Top Ten PM USA Packings Only From PM USA or Shipping Such Packings to Non-Affiliated Direct Distributor.**  If a Direct-Buying Site fails to meet any of its obligations under Part VI.A. twice during any 12-month period, Participant's Payment for that Direct-Buying Site for the Quarter in which the second failure occurs will be reduced by 33%.  If a Direct-Buying Site fails to meet any of its obligations under Part VI.A. three times during any 12-month period, Participant's Payment for that Direct-Buying Site for the Quarter in which the third failure occurs will be reduced by 66%.  If a Direct-Buying Site fails to meet any of its obligations under Part VI.A. four times or more times during any 12-month period, Participant's Payment for that Direct-Buying Site for the Quarter in which each such failure occurs will be reduced by 100%.

**XIII.   PM USA REMEDIES**

    **A.   Forfeiture of Payments.**

        **1.   Knowing Submission of Incorrect Data.**   If PM USA determines that Participant knowingly submitted incorrect Data or other information relating to Participant, a Related NDD, or Participant's performance under this Agreement, Participant will forfeit all Payments for the Quarter in which the incorrect submission occurred.

        **2.   Failure to Meet General Obligations of Participant under the Program.**   If Participant fails to meet any of its obligations under Part VI. (other than its obligation with respect to the Purchase or Shipment of Top Ten PM USA Packings), Participant will forfeit all Payments for the Quarter in which the failure occurred.

    **B.   Recoupment of Additional Payments.**   If Participant is subject to forfeiture of Payments pursuant to Part XIII.A., PM USA will require that Participant pay PM USA an amount equal to all Payments PM USA made to Participant for up to three additional Quarters prior to the Quarter subject to the forfeiture.  PM USA will not exercise its right to require additional payments with respect to a failure by Participant to meet its Payment-Eligible Volume Obligations under Part VI.C.

    **C.   PM USA's Right to Immediate Termination of this Agreement.**   PM USA may terminate this Agreement immediately upon written notice to Participant if:

        **1.**   Participant is subject to forfeiture of Payments pursuant to Part XIII.A.  However, PM USA will not terminate this Agreement with Participant's Direct-Buying Site's failure to meet its Payment Eligible Volume Obligations under Part VI.C. unless Participant's Direct-Buying Site fails to meet such obligations two times within eight Quarters;

        **2.**   Participant fails to pay or repay any amounts to PM USA under Part XII. or this Part XIII., or any corresponding provision under a prior PM USA Wholesale Leaders Program Participation Agreement;

        **3.**   Voluntary or involuntary proceedings are instituted to adjudicate Participant as bankrupt or insolvent, or Participant files a petition, answer or consent seeking reorganization or release under the federal Bankruptcy Code, or any other applicable federal or State law, or Participant consents to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee, or other similar official, of Participant, or any substantial part of Participant's property, or Participant makes an assignment for the benefit of creditors, or the takes corporate action in furtherance of any such action;

        **4.**   Participant admits to a secured or unsecured creditor that Participant is unable to pay its debts as they become due;

        **5.**   PM USA, in its sole discretion, deems itself insecure of Participant's ability to abide by the terms and conditions of this Agreement or any other written agreement by and between PM USA and Participant, or of Participant's ability to pay any sums due or to become due to PM USA; or

        **6.**   Participant, or any of its officers, directors, or owners with Control are indicted or convicted, whether by trial or by plea agreement, of any criminal offense related to the sale or distribution of Tobacco Products during the term of this Agreement.

    **D.   Other Remedies**

        **1.   Withholding of Payments.**   PM USA reserves the right to withhold, delay, or adjust any Payment if PM USA determines that Participant or a Related NDD is in violation of any term or condition of this Agreement or if PM USA determines that there is a need to review, investigate, or resolve issues relating to Participant or Related NDD or Participant's satisfaction of obligations under this Agreement.

        **2.   Recovery of Excess Payments Based on Incorrect Data.**   If PM USA determines during or after the term of this Agreement that Participant submitted incorrect Data or other information with respect to itself, a Related NDD or Participant's performance under this Agreement or a prior PM USA Wholesale Leaders Program Participation Agreement, and PM USA further determines that based on such

incorrect Data or information PM USA made Payments or granted Participant other benefits (including Terms Rates) that were in excess of the Payments or benefits Participant would have received if the Data or information had been correct, PM USA will require Participant to repay to PM USA the amount of any such excess Payments or benefits.

**3.     Immediate Termination of Direct-Buying Status.**  If a Direct-Buying Site fails to place at least one revenue order, not including Promotional Product, with PM USA during a Quarter, the Direct-Buying Site will no longer be permitted to buy PM USA Products directly from PM USA.

**E.     Remedies Cumulative, Not Exclusive.**  The rights and remedies of PM USA under Part XIII. and Part XV.H. are cumulative and not exclusive of one another or of any other remedies afforded to PM USA under this Agreement or applicable law. PM USA may, in its sole discretion, seek any applicable remedy under this Agreement or otherwise, even if another more specifically tailored or lesser remedy is provided for under this Agreement.

## XIV.    ACQUISITIONS, SALES, AND CHANGES IN CONTROL.

**A.     Acquisitions.**

**1.     Assumption of Debt Owed to PM USA.**  If Participant acquires all or a substantial part of the business or assets of any Person that is a Distributor or retailer of cigarettes, Participant will automatically be deemed to have assumed and will timely pay any and all outstanding debt and other financial obligations that Person owes to PM USA.

**2.     Prorating of Payments.**  If Participant acquires all or a substantial part of the business or assets of a Direct Distributor, PM USA may, in its sole discretion, prorate between Participant and the acquired Direct Distributor any PM USA Payments that may be due and payable to Participant or such Direct Distributor.

**B.     Sales or Changes in Control.**  If there is a sale by Participant of all or a substantial part of Participant's business or assets or a Change in Control then the following applies:

**1.     No Assignment.**  Participant may not assign any rights under this Agreement to any Person, including the purchaser or surviving entity of a Change in Control, without the prior written consent of PM USA. If the purchaser or surviving entity is not a Direct Distributor, PM USA consent will be subject to the purchase or surviving entity becoming a Direct Distributor at PM USA's discretion; and

**2.     Prorating of Payments.**  If the purchaser or surviving entity of a Change in Control is a Direct Distributor, PM USA may, in its sole discretion, prorate between Participant and such Direct Distributor any Payments that may be due and payable to Participant or such Direct Distributor.

## XV.    GENERAL TERMS AND CONDITIONS.

**A.     Eligibility and Effective Date of Agreement.**  Eligibility for participation in the Program is limited to Persons that purchase Tobacco Products directly from PM USA. Participation is effective upon (1) execution of this Agreement; (2) receipt by PM USA of all disclosures required of Participant by Part VI.D.1.; and (3) approval of this Agreement by PM USA or its designee.

**B.     PM USA Designated Agents.**  PM USA has designated AGDC as its agent for purposes of all sales-related activities at wholesale and retail, including the offering and execution of the Program. PM USA has designated ALCS as its agent for purposes of financial and due diligence matters.

**C.     Undisclosed Related Distributor.**  When PM USA deems it necessary and appropriate to maintain the integrity and purpose of the Program, PM USA may determine, in its sole discretion, that a Distributor that Participant did not identify as an Affiliate is a Related Distributor for purposes of calculating PM USA Share and Payments under this Agreement. PM USA will notify Participant in writing of such determination.

**D.     PM USA Determinations Final.**  PM USA will make all calculations necessary to determine (1) when a Payment is earned and payable, the amount of such Payment, and when such Payment will be made

(including the calculation of PM USA Qualified Shipments, Industry Qualified Shipments and Payment-Eligible Outbound Shipments used to calculate Payments), and (2) when a Terms Rate is available and the amount of the applicable Terms Rate. All such determinations and calculations by PM USA will be final.

**E.      Resolution of Certain Issues.** In the event that (1) an issue arises with respect to the accuracy of Data submitted by Participant under Part II.A., Participant's compliance with this Agreement in any respect or Participant's right to obtain benefits under this Agreement; (2) Participant does not timely produce, upon the request of PM USA or its designee, books, records, or documentation required to be maintained by Participant under Part VI.F.; and (3) PM USA reasonably believes that such requested books, records, or documentation contain information that would assist in the resolution of the issue, then, with respect to any dispute between PM USA and Participant in which such books, records, and documentation would have been considered (as evidence or otherwise), Participant agrees that it will be precluded from relying on any such books, records, or documentation if later produced by Participant and from asserting any position with respect to facts or circumstances that such missing books, records, or documentation might have proven if they had been available.

**F.      Modification/Termination of Program.** PM USA reserves the right to alter, amend or modify the terms and conditions of this Agreement, or terminate the Program, at any time and for any reason, upon notice to all Direct Distributors. PM USA may amend or modify this Agreement from time to time in its sole discretion by providing written notice to Participant. Participant's purchase of PM USA Products from PM USA after notice of such amendment or modification will constitute Participant's acknowledgement and acceptance of the terms of this Agreement as so amended or modified.

**G.      Alteration of Terms.** No member of the AGDC field sales has the authority to modify, amend, or otherwise alter any terms or conditions of this Agreement.

**H.      Termination of this Agreement upon Notice.** Participant or PM USA may terminate this Agreement, with or without cause, effective 30 days after notice to the other in accordance with the notice requirements set forth herein.

**I.      Results of Termination - Termination of Direct-Buying Status.** If PM USA terminates this Agreement, other than as a result of the replacement of this Agreement, Participant will not be permitted to buy PM USA Products directly from PM USA.

**J.      Ownership of Data.** All Data submitted by Participant will become the property of PM USA and will be subject to the confidentiality provisions of Part XV.K.

**K.      Confidentiality.**

        1.      Participant and its employees and agents will hold strictly confidential all information and materials provided by PM USA or any Affiliate of PM USA to Participant that are designated as confidential. Participant will not use or disclose to any third party any such information or materials without the prior, written consent of PM USA; provided, however, that Participant may disclose, after giving PM USA notice and an opportunity to seek a protective order or other relief, such information or materials as may be required by law, regulation, rule, order, or legal, judicial, or administrative process, or in cooperation with requests of governmental authorities. Participant's obligation to maintain such confidentiality will survive the termination of this Agreement.

        2.      PM USA, its Affiliates, and their respective employees and agents will hold strictly confidential all information and materials provided by Participant to PM USA or its Affiliates that are designated by Participant in writing as confidential. Neither PM USA nor any Affiliate will use or disclose to any third party any such information or materials without the prior written consent of Participant; provided, however, that (a) PM USA or any PM USA Affiliate may include Customer-specific Data in presentations to that particular Customer; (b) PM USA or any PM USA Affiliate may use and disclose Data for any purpose, provided that such Data is stripped of all information that would specifically identify Participant as the source of the Data; (c) PM USA or any PM USA Affiliate may disclose to any PM USA Affiliate, or to any agent or independent contractor of PM USA or any PM USA Affiliate (including employees, attorneys, consultants, and accountants), any Data, information or materials provided by Participant to PM USA, any PM USA Affiliate, or their respective agents or independent contractors (including employees, attorneys, consultants, and accountants); and (d) PM USA or any PM USA Affiliate may disclose any information or materials provided by Participant as may be required by law, regulation, rule, order, or legal, judicial, or administrative process, or in an effort to cooperate with

governmental authorities.  The obligations of PM USA and its Affiliates to maintain confidentiality will survive the termination of this Agreement.

**L.      Taxpayer Identification Number.**  PM USA will only make Payments associated with this Agreement if Participant has provided its taxpayer identification number to PM USA or its Affiliates.

**M.      PM USA Brand Indicia.**  Participant recognizes and acknowledges that the PM USA brand names and the designs, emblems, slogans, and indicia of the PM USA brands, and the goodwill associated therewith ("PM USA Brand Indicia"), have great value and are the sole property of PM USA, and Participant agrees that it has and will claim no right, title, or interest in or to any PM USA Brand Indicia or the right to use any PM USA Brand Indicia except in accordance with the terms and conditions of this Agreement.  Participant also agrees that it will not use any PM USA Brand Indicia in its corporate or trade name and will not use any PM USA Brand Indicia in marketing its business except to promote the sale of PM USA Products to its Customers.  Participant will advertise or communicate PM USA Brand Indicia accurately as of the time of such advertisement or communication, including with respect to price lists, invoices, or other similar documentation.

**N.      Independent Status.**   This Agreement will not be construed to create an association, partnership, joint venture, relation of principal and agent, or employer and employee between PM USA and Participant or its employees, agents, or subcontractors, within the meaning of any federal, State, or local law.  Participant is not authorized to and will not enter into any agreement, oral or written, on behalf of PM USA or otherwise obligate PM USA without PM USA's advance, written approval.

**O.      Indemnification.**  Participant agrees to indemnify and hold harmless PM USA, its Affiliates, and their respective officers, employees, directors, and agents from all claims, liabilities, costs, and expenses, including reasonable attorneys' fees, that arise from, or may be attributable to any error, omission, or fault of Participant, including, but not limited to, Participant's failure to pay or cause to be paid any applicable State or local excise taxes due on PM USA Products purchased or sold by Participant.  Participant's obligation to indemnify and hold harmless PM USA, its Affiliates, and their respective officers, employees, directors, and agents will survive the termination of this Agreement.  PM USA will have primary control of the defense or settlement of any claim against PM USA, its Affiliates, and their respective officers, employees, directors, and agents; provided, however, that Participant will have the right to participate at its own expense in the defense or settlement of any claim that is asserted against Participant.

**P.      Deductions or Setoff.**  Participant agrees that it will not make any deduction from any amount due to PM USA at any time, whether under this Agreement or any other agreement between PM USA and Participant, and whether under a claim of offset, recoupment, dispute, or otherwise.  Participant agrees that PM USA may, but is not obligated to, recoup, offset, or otherwise reduce or withhold any Payment or payment under any other agreement between PM USA and Participant from or by any outstanding amount due to Participant from PM USA hereunder or thereunder.

**Q.      Exercise of Rights; Non-Waiver.**  Neither failure nor delay on the part of PM USA to exercise any right, power, or privilege hereunder will operate as a waiver or relinquishment thereof, nor will any single or partial exercise of any other right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**R.      No Assignment.**  This Agreement may not be assigned by Participant in whole or in part, either directly or by operation of law, except as permitted under and in accordance with Part XIV.B.1.

**S.      Participation Costs.**  Payments made by PM USA to Participant under this Agreement are made in full and complete consideration of Participant's strict compliance with the terms and conditions of this Agreement.  Participant will bear its own costs and expenses in performing its obligations under this Agreement.

**T.      Taxes.**  Any tax liabilities, including but not limited to income, sales, transfer, use, or excise taxes payable in connection with the Payments and other transactions contemplated by the Program, if any, are the sole responsibility of and will be paid by Participant.

**U.      Attorneys' Fees.**  In the event that PM USA is required to engage the services of any attorneys for the purpose of enforcing this Agreement, or any provision thereof, PM USA will be entitled to recover its reasonable attorney's fees, expenses and costs in enforcing this Agreement or provision.

**V.      Construction.**  The parties to this Agreement have had the opportunity to consult legal counsel regarding the terms hereof, and, therefore, this Agreement will not be construed for or against either party hereto.

**W.      Governing Law.**  This Agreement and any disputes related to or arising out of this Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to any conflict of law provisions thereof that would cause the application of the laws of any jurisdiction other than the Commonwealth of Virginia.

**X.      Submission to Jurisdiction.**  Each of the parties hereto hereby agrees that all actions, suits, or other proceedings arising out of or relating in any way to this Agreement will be brought only in (1) the General District Court and Circuit Court of the Commonwealth of Virginia, Henrico County or (2) the United States District Court for the Eastern District of Virginia, Richmond Division.  Each of the parties hereto hereby knowingly, voluntarily, intelligently, absolutely, and irrevocably waives and agrees not to assert any objection he, she, or it may now or hereafter have to the laying of venue of all actions, suits, or proceedings arising out of or relating in any way to this Agreement in such courts and irrevocably consents to the jurisdiction of such courts for such purposes.  Each of the parties hereto hereby knowingly, voluntarily, intelligently, absolutely, and irrevocably waives and agrees not to assert in any such action, suit, or proceeding that he, she, or it is not subject to the personal jurisdiction of such courts or that the action, suit, or proceeding should be transferred to a different venue under forum non conveniens principles or statutes embodying such principles.  The parties agree that this Part XV.X. will apply even where there are third parties to or involved in an action, suit, or other proceeding covered by this Part XV.X.

**Y.      Waiver of Jury Trial.**  Each of the parties hereto hereby knowingly, voluntarily, and intelligently waives any rights he, she, or it may have to a trial by jury with respect to any litigation based hereon, or arising out of, under, or in connection with, this Agreement or any course of conduct, course of dealing, oral or written statements, or actions of any of the parties hereto in connection with this Agreement.  This provision is a material inducement for PM USA to enter into this Agreement.

**Z.      Severability.**  If any provision of this Agreement is held invalid or unenforceable, the remaining provisions will remain in effect.

**AA.      Notices.**

**1.      Notices.**  If at any time PM USA wishes to give any notice or other communication to all Direct Distributors, including notices of alterations, amendments, or modifications of this Agreement or the termination of the Program, PM USA may deliver such notice or other communication to Participant in writing by posting such notices on its website, www.altriasales.com, or by using e-mail, mail, fax, or such other means as PM USA shall determine.  All notices and other communications hereunder will be deemed to have been made: (a) when delivered: if in person, by confirmed facsimile transmission, or by certified or registered mail return receipt requested; (b) if sent by recognized overnight delivery service, the date after it is sent; (c) when sent: if sent through e-mail or by postage prepaid first class mail; or (d) if posted on PM USA's website, when posted.  In each case notice will be provided as follows:

To Participant:  On www.altriasales.com or at the address, facsimile number, or e-mail address listed on this Agreement.

To PM USA:  By delivery of such notice to the AGDC Section Sales Director for the State in which Participant has its headquarter office.  Addresses of AGDC Section Sales Offices are available on www.altriasales.com.

**BB.      Counterparts; Execution.**  To facilitate execution, this Agreement may be executed in as many counterparts as may be required, and each such counterpart will be deemed to be an original instrument, but all such counterparts together will constitute a single agreement.

**CC.      Titles and Headings.**  The titles, headings, and captions in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.  All references in this Agreement to parts, paragraphs, subparagraphs, and exhibits, if any, will, unless otherwise provided, refer to parts, paragraphs, and subparagraphs of this Agreement and the exhibits incorporated herein by reference.

**DD.      Entire Agreement.**  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior and contemporaneous proposals, discussions, understandings, and agreements, whether oral or written, between the parties on this subject matter.

**EE.** **No Third-Party Beneficiaries.** Nothing in this Agreement shall be construed to confer upon any third party any rights or benefits under this Agreement or otherwise.

**FF.** **Participant Signature.** This Agreement must be signed and accepted by an authorized representative of Participant.

**END OF DOCUMENT**